589 So.2d 887 (1991)
Henry Jose ESPINOSA, Appellant,
v.
STATE of Florida, Appellee.
No. 73436.
Supreme Court of Florida.
July 11, 1991.
Rehearing Denied November 27, 1991.
*889 Sheryl J. Lowenthal, Sp. Asst. Public Defender, Coral Gables, for appellant.
Robert A. Butterworth, Atty. Gen. and Michael J. Neimand, Asst. Atty. Gen., Miami, for appellee.
PER CURIAM.
Henry Jose Espinosa appeals to this Court to review his conviction and sentence of death for the first-degree murder of Teresa Rodriguez. Espinosa additionally appeals his convictions for the second-degree murder of Bernardo Rodriguez, the attempted murder of Odanis Rodriguez, grand theft, and burglary. We have jurisdiction pursuant to article V, section 3(b)(1), of the Florida Constitution.
Espinosa was tried together with his codefendant, Mauricio Beltran-Lopez. The state introduced evidence showing that the murders were committed in the following manner. At one time Espinosa had been neighbors with Bernardo and Teresa Rodriguez and their daughters, Odenia and Odanis. On the night of the murders, Espinosa and Beltran-Lopez went to the Rodriguezes' home. A violent struggle ensued in the kitchen during which the defendants shot and stabbed Bernardo Rodriguez to death. The defendants then grabbed Teresa Rodriguez and dragged her to the master bedroom where apparently Beltran-Lopez suffocated her with a pillow while Espinosa repeatedly stabbed her. The defendants then went to Odanis's room which *890 was locked. Espinosa lured her out by telling her that her mother wanted her. When Odanis opened the door, Beltran-Lopez grabbed her while Espinosa repeatedly stabbed her. The defendants then left, taking some money with them. Odanis's sister, Odenia, telephoned a family friend who came and took the sisters to the hospital.
At the trial Odanis, who was eleven years old at the time of the murders, testified that during the early morning hours of July 10, 1986, she was in her room and heard her mother's and Espinosa's voices. Odanis recognized Espinosa's voice since he had been her neighbor. The telephone in her room rang and a man, whom she later identified as Beltran-Lopez, came into her room, pulled the telephone cord from the wall, and left. Odanis then opened her door and saw Espinosa holding a knife while Beltran-Lopez held her mother. Her mother signalled her, so she went back into her room and locked the door. She then heard her mother say, "Don't, Henry, don't." Espinosa then came to her door and told her that her mother wanted her. When she opened the door, Beltran-Lopez grabbed her and Espinosa started stabbing her. Later, at the hospital, Odanis identified Espinosa and Beltran-Lopez as the assailants from photographic lineups.
Odenia, who was twelve years old at the time of the murders, testified that she had heard her mother tell Espinosa that if he would leave she would not call the police. She also heard Espinosa call Odanis out of her room. She, too, had recognized Espinosa's voice because he had been their neighbor, and she had picked his picture out of a photographic lineup.
The medical examiner testified that Bernardo had been shot once and stabbed six times. Teresa had been smothered with a pillow, stabbed six times, and strangled while she was alive. The parties stipulated that Odanis was stabbed sixteen times. A fingerprint expert testified that a bloody palm print from the refrigerator was Beltran-Lopez's and a bloody fingerprint was Espinosa's. Beltran-Lopez's bloody prints were also found on a chair cover. A serologist testified that blood consistent with Beltran-Lopez's blood, from a wound to his hand, was found in several areas of the house. The serologist also testified that blood consistent with Teresa and Odanis's blood was found spattered on a pair of shorts in Espinosa's car. A Ms. Lanza, with whom Beltran-Lopez had been staying, testified that Beltran-Lopez and Espinosa brought a pack of money to her house after the murders and asked her to keep it for them, telling her it was a loan. Specks of blood were found on the money.
Espinosa, himself, testified at the trial that Bernardo had hired him to drive trucks. On the night of the murders, Espinosa and Beltran-Lopez went to the Rodriguezes' house to pick up the trucks. Bernardo then asked them to haul marijuana, but Espinosa refused. Bernardo then threatened Espinosa, and Teresa came out into the kitchen and pointed a gun at Espinosa. Beltran-Lopez then grabbed the gun and Bernardo grabbed a knife. Beltran-Lopez then shot Bernardo and the two of them began struggling violently. Beltran-Lopez kicked and stabbed Bernardo to death. Espinosa testified that Beltran-Lopez next killed Teresa and then attempted to kill Odanis. Espinosa further claimed to have taken almost no active part in the killing with the exception of stabbing Odanis once with the intention of making Beltran-Lopez think Odanis was dead so that he would leave her alone.
Espinosa also presented evidence at the trial that Bernardo Rodriguez was involved in drug trafficking. A police officer testified that a car parked in the Rodriguezes' driveway was registered to a Maria Castellanos. When the police went to her house in the course of the murder investigation, they seized over a thousand pounds of marijuana and some marijuana-trafficking equipment. They also found a dump truck at Castellanos's house similar to one parked at the Rodriguezes' house. Further, a beeper found on a man who attempted to flee Castellanos's house bore the same telephone number as a beeper found in the Rodriguezes' kitchen. A fingerprint expert testified that Bernardo Rodriguez's fingerprints were found on a *891 cigarette pack in the car and on a candle-holder in Castellanos's house.
Beltran-Lopez did not testify during the guilt phase of the trial. The jury ultimately found both defendants guilty.
During the penalty phase of the trial, Espinosa presented several character witnesses who testified that he was a good person. Espinosa also made a statement on his own behalf. Beltran-Lopez also testified, stating that after he was arrested he had given a statement to the police concerning his involvement in the murders. He largely blamed the murders on Espinosa, admitting to only minimal participation. He did admit that he had stolen money from the house. Beltran-Lopez's mother testified that he was a good son.
The jury recommended the death penalty for Espinosa by an eleven-to-one vote.[1] The judge then sentenced Espinosa to death, finding in aggravation that (1) he previously had been convicted of a violent felony; (2) the murder was committed to prevent lawful arrest; (3) the murder was committed during armed burglary; and (4) the murder was especially heinous, atrocious, or cruel.[2] The judge found statutory mitigation of no significant criminal history and nonstatutory mitigation that Espinosa was a good man. Espinosa was additionally sentenced to life with a statutory three-year minimum for the second-degree murder, life for the attempted murder, five years for grand theft, and life with a three-year minimum for the armed burglary.
Espinosa's first claim in this appeal is that the trial court should have granted Espinosa's motion to have his trial severed from that of Beltran-Lopez. He claims that their defenses were sufficiently antagonistic so that the trial court should have granted severance under rule 3.152 of the Florida Rules of Criminal Procedure.
As this Court has previously stated:
Rule 3.152(b)(1) directs the trial court to order severance whenever necessary "to promote a fair determination of the guilt or innocence of one or more defendants... ." As we stated in Menendez v. State, 368 So.2d 1278 (Fla. 1979), and in Crum v. State, 398 So.2d 810 (Fla. 1981), this rule is consistent with the American Bar Association standards relating to joinder and severance in criminal trials. The object of the rule is not to provide defendants with an absolute right, upon request, to separate trials when they blame each other for the crime. Rather, the rule is designed to assure a fair determination of each defendant's guilt or innocence. This fair determination may be achieved when all the relevant evidence regarding the criminal offense is presented in such a manner that the jury can distinguish the evidence relating to each defendant's acts, conduct, and statements, and can then apply the law intelligently and without confusion to determine the individual defendant's guilt or innocence. The rule allows the trial court, in its discretion, to grant severance when the jury could be confused or improperly influenced by evidence which applies to only one of several defendants. A type of evidence that can cause confusion is the confession of a defendant which, by implication, affects a codefendant, but which the jury is supposed to consider only as to the confessing defendant and not as to the others. A severance is always required in this circumstance. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).
In situations less obviously prejudicial than the Bruton circumstance, the question of whether severance should be granted must necessarily be answered on a case by case basis. Some general rules have, however, been established. Specifically, the fact that the defendant might have a better chance of acquittal or a strategic advantage if tried separately does not establish the right to a severance. United States v. Cravero, 545 F.2d 406 (5th Cir.1976), cert. denied, 430 U.S. 983, *892 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); United States v. Perez, 489 F.2d 51 (5th Cir.1973), cert. denied, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). Nor is hostility among defendants, or an attempt by one defendant to escape punishment by throwing the blame on a codefendant, a sufficient reason, by itself, to require severance. United States v. Herring, 602 F.2d 1220 (5th Cir.), cert. denied, 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 732 (1979); United States v. Ehrlichman, 546 F.2d 910 (D.C. Cir.1976), cert. denied, 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977); Perez; Hawkins v. State, 199 So.2d 276 (Fla. 1967), vacated on other grounds, 408 U.S. 941, 92 S.Ct. 2857, 33 L.Ed.2d 765 (1972). If the defendants engage in a swearing match as to who did what, the jury should resolve the conflicts and determine the truth of the matter. As in this case, the defendants are confronting each other and are subject to cross-examination upon testifying, thus affording the jury access to all relevant facts.
McCray v. State, 416 So.2d 804, 806 (Fla. 1982) (footnotes omitted). Under this standard, Espinosa and Beltran-Lopez were clearly not entitled to separate trials. The fact that Espinosa testified at trial and was subject to examination by Beltran-Lopez's attorney is not a sufficient reason to grant severance. Further, Espinosa was not prejudiced by an inability to cross-examine Beltran-Lopez during the guilt phase since Beltran-Lopez did not testify and the state did not attempt to introduce Beltran-Lopez's confession. Beltran-Lopez did testify during the penalty phase, but Espinosa was able to cross-examine him. No evidence was introduced in this trial that could not have been introduced against either Espinosa or Beltran-Lopez if either had been tried alone. Therefore, we find that Espinosa and Beltran-Lopez were not entitled to a severance.
Espinosa additionally claims that the count charging him with the attempted murder of Odanis should have been severed from the other counts against him. He argues that rule 3.152(a)(2)(i) provides for severance here to promote a fair determination of his guilt on each count. He argues that he could not get a fair determination by combining the counts because he did not want to testify about Odanis's stabbing and because during the penalty phase the jury could not separate the stabbing of the eleven-year-old girl from her mother's murder.
We also reject this claim. The attempted murder of Odanis was part of the same single criminal episode in which her parents were murdered and as such was properly joined with the other counts. See Van Poyck v. State, 564 So.2d 1066 (Fla. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1339, 113 L.Ed.2d 270 (1991). The facts surrounding Odanis's attempted murder, Odanis's testimony recounting the events of that night, and her ability to identify Espinosa and Beltran-Lopez were an integral part of the prosecution's case concerning her parents' murders.
Espinosa next claims that the trial court should have allowed him to introduce evidence that Beltran-Lopez had a history of violent behavior when he lived in Nicaragua. Espinosa argues that this would have supported his defense that Beltran-Lopez flew into a rage during an argument with Bernardo Rodriguez and killed the Rodriguezes. Espinosa also argues that he should have been allowed to introduce evidence of Bernardo Rodriguez's conviction for a federal drug offense since that would have supported his assertion that the murders were precipitated by an argument over hauling marijuana.
We reject these claims. The evidence of Beltran-Lopez's violent history is clearly inadmissible under section 90.404, Florida Statutes (1987). If Espinosa's intention was to show that Beltran-Lopez had a generally violent character, then the evidence was inadmissible under section 90.404(1). That section states that "[e]vidence of a person's character or a trait of his character is inadmissible to prove that he acted in conformity with it on a particular occasion." This general rule has several exceptions, none of which applies to this evidence. If Espinosa intended to present *893 the evidence as similar fact evidence of other crimes, wrongs, or acts, then the evidence was inadmissible under section 90.404(2)(a) since it clearly would be offered solely to prove Beltran-Lopez's bad character or propensity.
The only basis for introducing evidence of Bernardo Rodriguez's conviction for a federal drug offense would be under section 90.404(1)(b)1, which permits the admission "of a pertinent trait of character of the victim of the crime offered by an accused."[3] Assuming, without deciding, that evidence of the conviction should have been admitted to support Espinosa's story that the murders were precipitated by an argument over transporting drugs, the error was harmless. Espinosa was allowed to present the testimony of the police officer who testified to the evidence linking Bernardo Rodriguez to the drug seizure at Maria Castellanos's house. Further, Bernardo's involvement in the drug trade was, at most, a peripheral issue with respect to whether Espinosa was guilty of murder.
Espinosa raises several other claims relating to the guilt phase of the trial. He claims the court should have granted his motion for costs to retain a professor of psychology to testify with respect to the reliability of eyewitness identification. We addressed that very issue in Johnson v. State, 438 So.2d 774, 777 (Fla. 1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984), where we concluded that "a jury is fully capable of assessing a witness' ability to perceive and remember, given the assistance of cross-examination and cautionary instructions, without the aid of expert testimony." The trial judge did not abuse his discretion in refusing to authorize costs for the expert testimony.
We also find no merit to Espinosa's claim that the serologist should not have been able to testify to the 1979 statistics on the demographics of blood types. The trial judge thoroughly considered the relevance of these statistics before he admitted them, and defense counsel was able to effectively cross-examine the serologist as to the statistics' reliability. Finally, the trial court did not abuse its discretion in refusing to give the jury a circumstantial-evidence instruction and a specific-intent instruction.
Turning to the penalty phase of the trial, Espinosa first claims that he was denied the time and money necessary to present mitigating evidence by flying in several of Espinosa's family members from Central America to testify to a history of mental and physical child abuse. Counsel claims that he did not make the motion to bring them to the United States until the beginning of the penalty phase because Espinosa had been embarrassed to tell him about the abuse until the penalty phase was imminent. Espinosa also claims that the judge should have granted him a delay to obtain new counsel for the penalty phase of his trial. Espinosa wanted to be represented by an experienced death-penalty lawyer from Texas, and he informed his counsel of this desire at the end of the guilt phase.
Espinosa and his counsel were aware for several months that the state would seek the death penalty. On the first day of the trial, the trial judge informed Espinosa and his attorney that he would begin the penalty phase of the trial approximately two hours after the jury returned its verdicts. Espinosa's counsel agreed to the procedure. "The granting or denial of a motion for continuance is within the discretion of the trial court." Williams v. State, 438 So.2d 781, 785 (Fla. 1983), cert. denied, 465 U.S. 1109, 104 S.Ct. 1617, 80 L.Ed.2d 146 (1984). The trial judge did not abuse his discretion. Any prejudice to Espinosa was a result of his own delay in preparing for the penalty phase of the trial.
Further, there was no abuse of discretion in not allowing one of Espinosa's former attorneys to testify that Espinosa was a kind, artistic person. The attorney was employed by the public defender's office which had been removed from this case *894 because its attorneys had at one time represented both defendants. We conclude that it was not error to exclude the testimony in view of the fact the attorney was going to testify as to the character of a client based on her observations while representing him earlier in the same case and because Espinosa was allowed to present five other character witnesses on his behalf.[4] The trial judge also did not err in limiting Espinosa's testimony during the penalty phase since it was largely a disjointed narrative in which he continued to argue his innocence. Espinosa had already testified extensively during the guilt phase of the trial as to his version of the events that occurred on the night of the murders. See Sireci v. State, 399 So.2d 964 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2257, 72 L.Ed.2d 862 (1982), overruled on other grounds, Pope v. State, 441 So.2d 1073 (Fla. 1983).
Espinosa next claims that the trial court should not have found the aggravating factor of a prior violent-felony conviction based on his conviction for Bernardo Rodriguez's murder. We reject this claim. See Correll v. State, 523 So.2d 562 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 152 (1988). We also find that the trial court had sufficient evidence to find that Teresa's murder was committed to avoid arrest since she could identify the defendants and had pleaded with them to leave, promising not to call the police, and since the defendants attempted to stab Odanis to death after she had seen them in the kitchen. The attempted murder of Odanis can properly be considered in support of this aggravating factor since it was relevant to the defendants' intent during the same criminal episode.
Espinosa also argues that the jury was improperly influenced by Odanis's attempted murder when they were considering the heinous, atrocious, or cruel aggravating factor. However, we find nothing in the jury instructions or elsewhere that indicates that the jury's deliberations with respect to whether Espinosa should be executed for Teresa's murder was improperly influenced by evidence concerning the attack on Odanis. The trial judge's finding that this aggravating factor applied was supported by the medical examiner's testimony that Teresa was alive while she was being strangled and repeatedly stabbed. We reject Espinosa's complaint with respect to the text of the jury instruction on the heinous, atrocious, or cruel aggravating factor upon the rationale of Smalley v. State, 546 So.2d 720 (Fla. 1989).
Finally, we find that the jury instructions did not denigrate the jury's role in sentencing in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). See Grossman v. State, 525 So.2d 833 (Fla. 1988), cert. denied, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989). We summarily reject Espinosa's general claims as to the unconstitutionality of the death penalty. We also note that Espinosa incorporated any applicable claims made by Beltran-Lopez in his appeal and that we have considered and rejected those claims in Beltran-Lopez v. State, 583 So.2d 1030 (Fla. 1991). Therefore, we affirm Espinosa's convictions and sentences.[5]
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD and GRIMES, JJ., concur.
BARKETT, J., dissents with an opinion, in which KOGAN, J., concurs.
KOGAN, J., dissents with an opinion.
BARKETT, Justice, dissenting.
Because I believe a severance of the defendants' trials was mandated in this case, I dissent. Where defendants are presenting antagonistic defenses, I believe that severance should generally be the rule in *895 the guilt phase and should always be the rule in the penalty phase of a death case. Particularly in the penalty phase, which is premised on the principle of individualized punishment, extreme animosity between defendants detracts from the real issues in the case and creates too great a risk of unfair prejudice to the defendants to refuse severence merely for the sake of judicial economy.
While severance may not be mandated in every case involving antagonistic defenses, I agree with the court in United States v. Berkowitz, 662 F.2d 1127 (5th Cir. Unit B Dec. 1981):
[T]he defense of a defendant reaches a level of antagonism (with respect to the defense of a co-defendant) that compels severance of that defendant, if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant. In such a situation, the co-defendants do indeed become the government's best witnesses against each other. Where two defendants present defenses that are antagonistic at their core, a substantial possibility exists [] that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.[]
Id. at 1134. In this case, the defenses and aggressive tactics of Espinosa's codefendant and his lawyer clearly met this standard, thus elevating the antagonism to a level not permitted by principles of due process. See Art. I, § 9, Fla. Const. Even under the Court's view that, in general, antagonistic defenses need not always result in severance, this case goes too far.
In essence, Espinosa was fighting two adversaries as codefendant's counsel relieved the state of much of its burden of proving the state's case beyond a reasonable doubt. Codefendant's counsel went far beyond merely exculpating his client and blaming Espinosa for the crime.[*]
After first being cross-examined by the state, Espinosa was then vigorously cross-examined by Beltran-Lopez's counsel on all aspects of his testimony. At final argument, Beltran-Lopez's counsel again attacked Espinosa and made the state's case for it. A review of the record reveals more than mere general antagonism among codefendants. I would reverse and sever the trials in this case.
KOGAN, J., concurs.
KOGAN, Justice, dissenting.
I would recede from the pertinent holding of McCray v. State, 416 So.2d 804, 806-07 (Fla. 1982), because I believe a strong possibility always exists for jury confusion whenever the testimony of codefendants is inconsistent and antagonistic, as it was here. Such testimony invites jurors to compare one defendant against the others, thus choosing who is "most guilty."
The purpose of a criminal trial is not to gauge defendants against each other, but to gauge their alleged crimes against the requirements of the law. Sometimes this may mean that one or more defendants will receive a harsher penalty; at others it may be more lenient. The rule, in other words, is two-edged. It is necessary, I believe, to ensure that jurors minds are focused on the merits of the guilt or innocence of the accused, not on the antagonism disclosed in two or more codefendants' testimony.
Accordingly, I would reverse the conviction and sentence and order new trials in which the cases of Espinosa and Beltran-Lopez are severed.
NOTES
[1] The jury recommended the death penalty for Beltran-Lopez by an eight-to-four vote, and he, too, was sentenced to death.
[2] § 921.141(5)(b), (d), (e), (h), Fla. Stat. (1985).
[3] Section 90.610, Florida Statutes (1987), is inapplicable since that section applies to the use of criminal convictions to impeach witnesses.
[4] See Muehleman v. State, 503 So.2d 310 (Fla.), cert. denied, 484 U.S. 882, 108 S.Ct. 39, 98 L.Ed.2d 170 (1987).
[5] At the oral sentencing proceeding, the trial judge erroneously sentenced Espinosa and Beltran-Lopez to a three-year statutory minimum for the life sentence for the attempted murder of Odanis. However, his written sentencing order correctly does not include a statutory minimum sentence on that count. See Lopez v. State, 470 So.2d 58 (Fla. 3d DCA 1985).
[*] For example, codefendant's counsel at opening statement told the jury:

Mr. Espinosa goes in, takes this woman, gets on top of her and stabs her, stabs her... .
... she had a gash right here on her belly that [the lead investigator] could actually see her spine from there.