934 So.2d 1100 (2006)
Eric SIMMONS, Appellant,
v.
STATE of Florida, Appellee.
No. SC04-19.
Supreme Court of Florida.
May 11, 2006.
Rehearing Denied July 11, 2006.
*1104 Janice C. Orr, Eustis, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, Stephen D. Ake and Scott A. Browne, Assistant Attorney Generals, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment of conviction of kidnapping, sexual battery using force likely to cause serious injury, and first-degree murder of Deborah Tressler, and a sentence of death for the murder conviction. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated herein, we affirm the convictions and sentence.

*1105 FACTS AND PROCEDURAL HISTORY
The charges against appellant, Eric Simmons, resulted from the kidnapping, sexual battery, and stabbing and beating of Deborah Tressler, who was found dead in a wooded area in Sorrento, Florida. Simmons was tried and found guilty of kidnapping, sexual battery using force likely to cause serious injury, and first-degree murder. The jury unanimously recommended death as the penalty for the murder. The trial court sentenced Simmons to death on the charge of first-degree murder and life in prison for each of the kidnapping and sexual battery charges respectively.[1]

Prosecution Evidence
The evidence presented at trial indicated that on December 3, 2001, at approximately 11:30 a.m., John Conley, a Lake County Sheriff's Office (LCSO) deputy, discovered the body of Tressler in a large wooded area commonly used for illegal dumping. The body was located some 270 feet from the main road. Crime scene technician Theodore Cushing took pictures of the body, performed a sketch of the area, and found five tire tracks near the body. The crime scene technicians took plaster cast impressions of the three tracks with the most detail for comparison purposes. Mr. Cushing noticed that the tire tracks indicated that a car made a three-point turn close to the body. All-terrain vehicle tracks were present closer to the body, but they appeared older and deteriorated.
The medical examiner, Dr. Sam Gulino, observed the victim and the surroundings at the scene on December 3, 2001, with the victim lying on her left side with her right arm over her face. Dr. Gulino estimated the time of death was twenty-four to forty-eight hours before the body was discovered.
Dr. Gulino performed an autopsy, which revealed numerous injuries. Tressler suffered some ten lacerations on her head, as well as numerous other lacerations and scrapes on her scalp and face.[2] There was a very large fracture on the right side of her head, and her skull was broken into multiple small pieces that fell apart when the scalp was opened. Dr. Gulino opined that this injury and the injuries to her brain resulted in shock and ultimately Tressler's death. There was another fracture that extended along the base of the skull, resulting from a high-energy impact; bleeding around the brain; and bruises in the brain tissue where the fractured pieces of skull had cut the brain. There were numerous stab wounds on the neck, a long cut across the front and right portions of the neck, and other bruises and cuts. There was little bleeding from these injuries, indicating that the victim was already dead or in shock at the time of the injuries. The victim also suffered a stab wound in the right lower part of her abdomen that extended into her abdominal cavity and probably occurred after she received the head injury. There were also injuries to her anus with bruising on the right buttock extending into the anus, and the wall of the rectum was lacerated. These injuries were inflicted before death. Dr. Gulino opined that these injuries would be painful and not the result of consensual anal intercourse. The victim suffered numerous defensive wounds on her forearms and hands. There was also a t-shaped laceration on the scalp and an injury at the base of her right index finger that was patterned, *1106 as if a specific type of object, like threads on a pipe, had caused it. Dr. Gulino opined that the attack did not occur at the exact spot where Tressler was found because of the lack of blood and disruption to the area, but stated that the position of Tressler's body was consistent with an attack occurring in that area.
On December 4, 2001, Robert Bedgood, a crime scene technician, collected evidence from Tressler's body during the autopsy.[3] Dr. Jerry Hogsette testified that, based on the temperature in the area of Tressler's body and the development of the insect larvae taken from Tressler's body, Tressler had been killed between midnight on December 1, 2001, and early Sunday morning, December 2, 2001.[4]
After identifying the body as Tressler's, crime scene technicians went to the trailer where Tressler lived and the laundromat where she worked to conduct Luminol testing. They found Tressler's purse at the laundromat and located a birthday list containing the names of Simmons' relatives. There was no evidence of violence in either place.
Andrew Montz testified that late on the night of December 1, 2001, he was at the Circle K convenience store at the intersection of State Road 44 and County Road 437 in Lake County. Mr. Montz saw a white four-door car heading northbound on 437, stopping at the traffic light very slowly, when a woman opened the passenger door and screamed, "Somebody help me. Somebody please help me." The driver pulled the woman back into the car and ran the red light quickly. Mr. Montz stated that the woman was wearing a white T-shirt or pajama-type top. He was not able to see the driver and described the car as a Chevy Corsica/Ford Taurus-type car with a dent on the passenger side, black and silver trim on the door panel, and a flag hanging from the window. After viewing a videotape of a white 1991 Ford Taurus owned by Simmons a year later, Mr. Montz identified it as being the car he saw on December 1. Mr. Montz initially told lead Detective Stewart Perdue that the car had spoked rims, but after viewing spoked rims at an auto parts store, he concluded that the rims on the car he saw were not spoked.
Sherri Renfro testified that she was at the same Circle K as Montz between 11:30 and 11:40 p.m. with her sister-in-law's boyfriend, Shane Lolito. She also saw a white car slowly approach the red light, the passenger door open, and a woman yell for help while looking directly at Ms. Renfro. Ms. Renfro yelled at the driver to stop, but he did not, and Ms. Renfro got into her van and chased after the car. She traveled in excess of the speed limit, but was unable to get close to the car and eventually lost track of it. Ms. Renfro thought that the car was a Chevy Corsica, but admitted that she "[did not] really know [her] cars too well." She recalled that the car had a patriotic bumper sticker in the rear window and a flag hanging from the back passenger window. She testified that there was a large spotlight on the side of the Circle K building that illuminated the surrounding area well. Ms. Renfro subsequently identified Simmons' white Ford Taurus as the car she saw at the intersection, *1107 and she recognized the interior, the bumper sticker, and the flag on the car. Ms. Renfro identified Tressler as the woman in the car when shown a photograph of her.
Jose Rodriguez testified that he knew Tressler from the laundromat, he often saw Simmons and Tressler together drinking, and he was familiar with Simmons' car. Mr. Rodriguez saw Simmons with Tressler at the laundromat on the night of December 1, 2001. When he arrived at the laundromat, he knocked on the glass window to get Simmons' attention and asked him to come outside. While Simmons was exiting, Mr. Rodriguez got Tressler's attention and asked if she was okay; she replied that she was. Mr. Rodriguez spoke with Simmons for a few minutes and then talked to his own girlfriend on the pay phone outside. When he finished, Simmons and Tressler were still inside the closed laundromat.
Mr. Rodriguez was arrested the next day on unrelated charges, and on December 5, 2001, police officers showed Mr. Rodriguez a photopack with about thirty-five pictures in it, but he was unable to identify any as Tressler's boyfriend. However, Mr. Rodriguez picked the picture that looked most like Simmons and he drew additional characteristics similar to those of Simmons. On December 7, Mr. Rodriguez positively identified a photograph of Simmons as Tressler's boyfriend.
Detective Perdue testified that he and other police officers went to Simmons' parents' home after confirming that Simmons owned a white 1991 Ford Taurus. Detective Perdue and Detective Kenneth Adams approached Simmons and asked him to walk to a group of trees so they could talk. There were some fifteen other police officers at the scene as well as a helicopter flying overhead. Simmons acknowledged that he knew Tressler was dead, and the detectives asked if Simmons would come to the sheriff's office to talk. Simmons consented, and the detectives transported him to the sheriff's office in the back of a police cruiser. The detectives handcuffed Simmons for their protection pursuant to their standard practice, and Simmons did not object. Detectives Perdue and Adams removed the handcuffs upon arrival at the office, and interviewed Simmons in a room equipped with audio and video capabilities, although the videotape was allowed to run out after two hours.
Simmons waived his Miranda[5] rights and stated that he was friends with Tressler and had tried to help her improve her living conditions.[6] Simmons explained to Detective Perdue that on December 1, 2001, he and Tressler had been watching the Florida-Tennessee football game at his apartment in Mount Dora. The reception was bad, so Tressler asked him to take her to the laundromat or her trailer so she could watch the game. He took her to the laundromat and then drove home because Tressler and he were supposed to go to work together early the next morning for his father's landscaping business. He stated that he had engaged in sexual intercourse with Tressler on one occasion approximately two weeks before the interview, even though Simmons' semen was found in Tressler's vaginal washings during her autopsy. During a break in the interview, the detectives learned that *1108 blood had been found in Simmons' car.[7] After the detectives informed Simmons of this, he stated, "Well, I guess if you found blood in my car, I must have did it."
Terrell Kingery, a crime lab analyst with the Florida Department of Law Enforcement (FDLE), examined the plaster tire casts from the scene of the crime and compared them to the tires on Simmons' car. The rear tires, which were different brands, were consistent with the three plaster casts. The dimension and general condition of the rear tires were consistent with two of the three casts.
Crime scene technician Ronald Shirley testified that when he performed a presumptive test for blood on a stain on the passenger door of Simmons' car, he obtained a positive result. Luminol testing was positive for blood on the area around the passenger seat cushion, the carpet below the passenger seat in the front and back, and especially the area of the passenger seat where one sits. Mr. Shirley noted that there were containers of partially consumed cleaning materials in the car. Technicians also cut the fabric off the seat cover and noted a large stain on the cushion itself.
Brian Sloan, a forensic DNA analyst, performed a mitochondrial DNA (mtDNA) sequence on the cushion stain and testified that, in his professional opinion, the stain on the cushion was blood. He testified that mtDNA is inherited maternally, and the mitochondrial genome is 16,500 pairs long. Most of these pairs are very similar between individuals, but approximately 610 bases are highly variable between individuals, and these variable bases can be used to differentiate between people. mtDNA testing differs from the Short Tandem Repeat (STR) technique for DNA profiling because the STR technique is specific to the DNA in the nucleus, or chromosomal DNA. Mr. Sloan testified that mtDNA is the better technique to use on degraded samples because the plasmid circular DNA in mitochondria have thousands of copies in a single cell.
Mr. Sloan compared the mtDNA extracted from the seat cushion to that of Lee Daubanschmide, Tressler's mother; determined that each had an anomaly in the same place; and concluded that the two DNA sequences were consistent. After noting the consistency, Mr. Sloan entered the sequence into the FBI database of 4,839 contributors to check for matches, and concluded that the sequence had never been seen in that group. Mr. Sloan also stated that mtDNA is present in several types of human biological fluid or material, such as bones, hair, saliva, semen, diarrhea, sweat, and menstruation. He noted that he did not run statistical calculations to determine the ninety-five percent confidence interval as had Dr. Rick Staub, the director of the lab. Dr. Staub had obtained an upper confidence limit of one in 1600 individuals, but was unable to testify at trial.
Shawn Johnson, a crime laboratory analyst with the FDLE, testified that he performed a presumptive chemical test on the cushion stain, which was positive for blood. He then took three different cuttings from three different areas, combined them into *1109 one sample, but did not get any DNA results. Mr. Johnson testified that the lack of DNA results indicated that there was degradation of the DNA. Mr. Johnson swabbed the front passenger door jamb of Simmons' car and obtained a DNA profile that matched Tressler's. Mr. Johnson also matched Tressler's DNA to other stains on the car trim.

Defense Evidence
The defense called a number of witnesses during its case. Stuart James, a defense witness who is an expert in blood stain pattern analysis, examined blood spatter in photographs of the doorjamb of Simmons' car and concluded that it was a limited amount of staining but that it was consistent with the size range found in beatings, stabbings, and sometimes gunshots.
Dr. Neal Haskell, a forensic entomologist, testified that he could not determine the time of Tressler's death from the insect specimens collected by the LCSO. He also could not determine whether Dr. Hogsette's opinion regarding the time of death was correct, but he opined that some of Dr. Hogsette's conclusions were faulty and that Dr. Hogsette was not qualified as a forensic entomologist.
Dr. Terry Melton, an expert in mtDNA analysis, testified that the State's lab results regarding the match with the mtDNA were correct, but its statistical analysis that the mtDNA sequence had never been seen in the FBI database was incorrect. Dr. Melton stated that the State's lab did a search of the DNA bases only on a portion of the DNA they obtained. In Dr. Melton's lab, they compare all 783 of the DNA bases to the known DNA bases. When Dr. Melton ran the data in the database according to her lab's methods, she found a common type sequence in 105 of the 4839 people in the database.
Dr. Wilber Frank, a veterinarian and local resident, testified that he encountered a white four-door car driving very slowly at the intersection of State Road 44 and Seminole Springs Road at about 11 a.m. on December 2, 2001, near the area where the victim's body was found. The driver appeared to be an older white male.
At the conclusion of the trial's guilt phase, the jury found Simmons guilty of kidnapping, sexual battery using force likely to cause serious injury, and murder in the first degree, all as charged in the indictment.[8]

Penalty Phase
During the penalty phase, the State presented victim impact evidence from a customer of the laundromat where Tressler worked and Tressler's father. The defense produced the probable cause affidavit involving Simmons' prior conviction in 1996 for aggravated assault with a deadly weapon against a law enforcement officer. Defense counsel also called a corrections officer to testify regarding Simmons' behavior while he was incarcerated during the trial, and Simmons' sister to provide character evidence for Simmons.[9]
*1110 The jury unanimously returned an advisory verdict recommending a death sentence for the murder. The special interrogatory verdict form specifically indicated that the jury found unanimously that the State had proven three aggravating factors beyond a reasonable doubt: (1) Simmons was previously convicted of a felony involving the threat of violence to a person; (2) the crime for which Simmons was to be sentenced was committed during the commission of or attempt to commit sexual battery, kidnapping, or both; and (3) the crime for which Simmons was to be sentenced was heinous, atrocious, or cruel (HAC).
The trial court held a Spencer[10] hearing and heard testimony from Dr. Elizabeth McMahon, the defense's mental health expert. She testified that Simmons had a moderate-to-severe learning disability but no significant history of violence. Because the jury was not privy to these opinions, the trial court considered the jury's recommended sentence, but also independently weighed the evidence of aggravating and mitigating circumstances in determining Simmons' sentence. The trial court agreed with the jury's findings of the three aggravators, giving moderate weight to the prior felony conviction aggravator and great weight to the other two. The court rejected the defense's proposed statutory mitigating circumstance of Simmons' age of twenty-seven because there was no evidence that he functioned at a level below his age in anything but reading. The court also rejected all other statutory mitigating factors, but found a number of nonstatutory mitigating factors: (1) Simmons manifested appropriate courtroom behavior (some weight); (2) Simmons was kind to the victim (some weight); (3) Simmons loves and cares for animals (minimal weight); (4) Simmons was active in his church and a mentor to boys who belonged to the church's Royal Rangers (some weight); (5) Simmons had a good family background and came from a closely knit, caring family (some weight); (6) Simmons was employed (some weight); (7) Simmons has a learning disability (some weight); and (8) Simmons is immature (some weight). The trial court rejected three other proposed mitigating circumstances as either not proven or not mitigating in nature, and imposed the death penalty for the murder.[11]

ISSUES ON APPEAL
On appeal, Simmons raises eleven issues: (1) the guilty verdicts on the charges of kidnapping, sexual battery, and murder are not supported by the evidence; (2) the trial court did not have jurisdiction and venue was not proper in Lake County; (3) the trial court erred in denying Simmons' motion to suppress his statement to law enforcement officers and evidence obtained from the search of his vehicle; (4) *1111 the trial court erred in allowing the State's expert on mtDNA to testify before the jury; (5) the prosecuting attorney made improper remarks regarding the mtDNA evidence; (6) the trial court erred in excluding the testimony of a defense expert in eyewitness identification; (7) the trial court erred in allowing the State's entomology expert to testify as an expert in the life cycle of flies; (8) the trial court erred in denying Simmons' motion to exclude an in-court identification of Simmons' vehicle; (9) the prosecutor engaged in misconduct that rose to the level of preventing a fair trial; (10) Florida's death penalty statute is unconstitutional; and (11) the trial court erred in imposing aggravators to arrive at the death sentence. We address each of these issues.[12] In addition, although not raised by Simmons, we have reviewed the record and conclude that, in light of the totality of the circumstances, Simmons' death sentence is proportionate when compared to the facts of other death penalty cases.

I. Sufficiency of the Evidence
In Simmons' first issue on appeal, he contends that the evidence against him is not sufficient to support the trial court's guilty verdicts on the charges of kidnapping, sexual battery, and first-degree murder. "In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Bradley v. State, 787 So.2d 732, 738 (Fla.2001) (citing Banks v. State, 732 So.2d 1065, 1067 n. 5 (Fla.1999)).
In this case, there was physical evidence and eyewitness testimony, as well as Simmons' statements, linking Simmons to Tressler at the time of the murder. We agree with the State that the jury, as the trier of fact, was entitled to draw an inference that Simmons was acknowledging guilt from his statement that he "must have did it." Therefore, this case is not entirely circumstantial. See Pagan v. State, 830 So.2d 792, 803 (Fla.2002) (stating that when the evidence in a case is "both direct and circumstantial, it is unnecessary to apply the special standard of review applicable to circumstantial evidence cases"). A confession constitutes direct evidence of guilt. Floyd v. State, 850 So.2d 383, 406 (Fla.2002) (citing Walls v. State, 641 So.2d 381, 390 (Fla.1994)).
Further, Mr. Rodriguez testified that Simmons was the last person seen with Tressler in the laundromat on the evening *1112 of December 1, 2001. Eyewitnesses then saw Tressler trying to escape Simmons' car and screaming for help at the intersection of State Road 44 and County Road 437. Three eyewitnesses identified the car they saw on the night of December 1, 2001, as resembling a Chevrolet Corsica or Ford Taurus and possessing characteristics matching Simmons' car. There was blood spatter in Simmons' car and a large, degraded blood stain on the passenger seat. Tire track impressions taken from the area near where Tressler's body was discovered matched the two rear tires of Simmons' car, which were two different tire models. Simmons' semen was found in Tressler's vaginal washings. Dr. Gulino testified that Tressler's autopsy revealed extensive injuries to her anus not consistent with consensual anal sex. In light of these facts and circumstances, we conclude that there is sufficient evidence to find Simmons guilty of kidnapping, sexual battery, and first-degree murder. See Thomas v. State, 894 So.2d 126, 131-32, 134-35 (Fla.2004) (holding that a combination of direct eyewitness testimony, the defendant's confession, and circumstantial evidence that defendant continued to confine victim while intending to inflict harm because she was eventually sexually assaulted and murdered supported a conviction of kidnapping and first-degree murder), cert. denied, 544 U.S. 1003, 125 S.Ct. 1939, 161 L.Ed.2d 779 (2005).

II. Jurisdiction and Venue
In his next issue on appeal, Simmons argues that the trial court erred in determining that it had jurisdiction to try Simmons because the State admitted it had no knowledge of exactly where the crimes occurred. In contrast, the State points out that jurisdiction is distinct from venue, and a circuit court has jurisdiction to adjudicate a first-degree murder case. Further, the State notes that venue is sufficiently proven if the jury can reasonably infer from the evidence that the crime occurred in the county where the trial occurs.[13]
The circuit courts have exclusive original jurisdiction over all felonies. Art. V, § 5(b), Fla. Const.; § 26.012(2)(d), Fla. Stat. (2003). A person can be prosecuted in this state for a crime if the offense is committed either wholly or partly within this state. § 910.005(1)(a), Fla. Stat. (2003). Because a circuit court has original jurisdiction over felonies, including murder, we find that the trial court properly denied Simmons' motion to dismiss for lack of jurisdiction.
As to venue:
Venue need not be established beyond a reasonable doubt. If the evidence raises a violent presumption that the offense was committed within the county, or if the evidence refers to localities and landmarks at or near the scene of the alleged offense, known or probably familiar to the jury, from which they may reasonably infer that the offense was committed in the county, it will be sufficient.
Lowman v. State, 80 Fla. 18, 85 So. 166, 167 (1920). In this case, it could reasonably be inferred that the felonies were *1113 committed in Lake County. The evidence in the trial court tended to show that eyewitnesses observed Tressler in Simmons' car screaming for help in Lake County on the night of December 1, 2001. Tressler's body was discovered in Lake County on the morning of December 3, 2001. While it is possible that the murder and sexual battery could have occurred in a different county, it is reasonable for a jury to infer that the crimes occurred in Lake County.

III. Simmons' Motion to Suppress Statements and Vehicle Evidence
Simmons argues that the trial court erred in refusing to suppress the statements he made to police because he did not voluntarily accompany authorities to the police station. Simmons also argues that the trial court improperly denied his motion to suppress the evidence law enforcement officers obtained from his vehicle. This Court has stated that "a suppression ruling comes to the reviewing court clad in a presumption of correctness as to all fact-based issues." State v. Glatzmayer, 789 So.2d 297, 301 (Fla.2001). Given the evidence before the trial court, we find no error.

A. Simmons' Statements
The trial judge denied Simmons' motion to suppress, determining that Simmons voluntarily submitted to the interrogation and, in the alternative, that the detectives had probable cause to detain Simmons for a custodial interrogation.

1. Voluntariness of the Interrogation
Simmons contends that, given the number of officers that surrounded his parents' Pine Lakes residence on December 7, 2001, a reasonable person in his position would not feel that he or she could decline the detectives' invitation to come to the sheriff's office. Further, Simmons contends that the fact that he was handcuffed and transported in the back of a caged, marked police cruiser belies the contention that he went voluntarily.
In support of his argument, Simmons cites to Hayes v. Florida, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985). In Hayes, police approached a burglary-rape suspect on his front porch and asked him to come to the police station for fingerprinting. Id. at 812, 105 S.Ct. 1643. An investigator threatened to arrest the suspect if he did not comply. Id. The United States Supreme Court determined that Hayes' detention was not consensual, and it reversed the conviction and remanded the case because the police did not have probable cause to detain the suspect. Id. at 814, 817-18, 105 S.Ct. 1643.
Unlike the defendant in Hayes, the uncontroverted testimony by the officers in this case indicates that Simmons never expressed any reluctance to accompany the detectives to the sheriff's office. The officers did not threaten Simmons with an arrest or try to coerce him in any way. These crucial factual differences distinguish Hayes from the present case.
Although Simmons contends that a "thundering herd" of police officers would render any reasonable person unable to refuse the detectives' invitation, the record shows that most of these officers were not directly involved in any confrontation with Simmons or the conversation between Simmons, Detective Adams, and Detective Purdue. These two detectives were not in uniform and were not armed when they conducted the initial interview at Simmons' parents' home. Moreover, although Simmons *1114 was handcuffed and transported in the back of a caged police cruiser, the State presented evidence that these measures were taken for the safety of the police officers involved and that police removed the handcuffs as soon as Simmons reached the sheriff's office. Nothing in the record indicates that Simmons objected to being handcuffed or at any time expressed a desire to terminate the encounter. Our recognition of the propriety of using handcuffs in noncustodial encounters with police is in line with this Court's prior case law. See, e.g., Taylor v. State, 855 So.2d 1, 18 (Fla.2003) (holding that the use of handcuffs during a trip from a police cruiser to an interrogation room did not render a detention custodial when the suspect was told that he was not under arrest). Under the totality of the circumstances, we find no error in the trial court's determination that a reasonable person in Simmons' position would have felt free to terminate the encounter with police.
Simmons does not deny that he signed a Miranda waiver before the detectives began to interview him at the sheriff's office, and he never asked to terminate the interview. The two detectives allowed Simmons to use the bathroom when he needed to, and the three even ate dinner together. Moreover, the detectives told Simmons that they would provide a ride home if his family could not come to get him, and they reassured Simmons that he was not under arrest.
Given the significant deference that we give to trial courts' fact-finding on motions to suppress, we conclude that the trial court did not abuse its discretion when it accepted the evidence presented by the State and determined that Simmons' December 7 interview with detectives was voluntary under the totality of the circumstances.

2. Probable Cause
Even if Simmons was able to successfully argue that his detention was custodial and not voluntary, he would still have to show that the police detained him without probable cause in order to prevail. See Blanco v. State, 452 So.2d 520, 523 (Fla.1984) (holding that the trial court properly denied defendant's motion to suppress evidence when there was probable cause to support his de facto arrest). In addition to finding that Simmons' encounter with detectives was voluntary, the trial court determined that the police had probable cause to detain Simmons.
We have stated that "[p]robable cause for arrest exists where an officer `has reasonable grounds to believe that the suspect has committed a felony. The standard of conclusiveness and probability is less than that required to support a conviction.'" Chavez v. State, 832 So.2d 730, 747 (Fla. 2002) (quoting Walker v. State, 707 So.2d 300, 312 (Fla.1997)). At the time of the interview, detectives had statements from Simmons' friends and acquaintances that indicated that he was Tressler's boyfriend and that he was the last person seen with Tressler while she was alive. They also had a statement from Mr. Rodriguez that he saw Simmons with Tressler between 10:30 p.m. and 10:45 p.m. on December 1, 2001. Moreover, Simmons' car matched the description of the car that two witnesses saw at about midnight on December 1, from which a woman matching the description of Tressler was attempting to flee. Detectives also had statements from witnesses that Simmons may have beaten Tressler earlier in the week, and they knew that he had previously been arrested for abusing a prior spouse or girlfriend.
This Court has stated that "[t]he existence of probable cause is not susceptible *1115 to formulaic determination. Rather, it is the `probability, and not a prima facie showing, of criminal activity [that] is the standard of probable cause.'" Doorbal v. State, 837 So.2d 940, 952-53 (Fla.2003) (citations omitted) (quoting Illinois v. Gates, 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Considering the totality of the circumstances and the evidence presented in this case, we cannot say that the trial court abused its discretion when it found that any custodial detention of Simmons was supported by probable cause.

B. Evidence from Simmons' Vehicle
Simmons also challenges the trial court's denial of his motion to suppress evidence seized from his vehicle on December 7, 2001, under a search warrant. Simmons alleges that factual inaccuracies plague the affidavit that supported the magistrate's decision to grant the search warrant. Simmons alleges that, after excising those portions of the affidavit that are inaccurate, the State is left with nothing upon which the magistrate could have found probable cause to authorize a search.
Deliberate falsity or reckless disregard for the truth in an affidavit that gives rise to a search warrant can, in some instances, lead to suppression of evidence obtained under that warrant. See Franks v. Delaware, 438 U.S. 154, 171-72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). However, we have held that an erroneous statement will only invalidate a search warrant if, after excising the erroneous statement, the remaining true statements are insufficient to establish probable cause. See Terry v. State, 668 So.2d 954, 958 (Fla.1996). In the instant case, the trial court ruled that there were, in fact, no intentionally or recklessly false statements.
First, Simmons alleges that the affidavit provides an inaccurate description of Detective Brewer's qualifications by stating that Detective Brewer had been a law enforcement officer since 1979 because Detective Brewer's certification lapsed for twenty years while he pursued a career as an attorney. The record, however, indicates that Detective Brewer was a sworn officer at the time that he signed the affidavit and that his experience as an officer dated back to 1979. Further, although Detective Brewer's Florida certification did lapse during the 1980s, his certification as a military police officer continued during this period and never lapsed. Given this evidence, we conclude the trial court did not err in concluding that the portion of the affidavit regarding Detective Brewer's qualifications was not false.
Next, Simmons alleges that the affidavit misstates the information that detectives obtained from Ms. Renfro. Detective Brewer's affidavit indicates that a witness observed a woman who matched the description of the victim and was screaming and attempting to flee a white Chevrolet Corsica-type car. Simmons cites to Ms. Renfro's statement to the police, which indicated that the woman that Ms. Renfro saw was in her mid-fifties, had short brown hair, and was wearing a white T-shirt. Because Tressler was actually forty-eight, had long black hair, and was wearing a grey shirt, Simmons argues that Ms. Renfro's description did not match the description of Tressler and that the affidavit is materially false.
However, as the trial court properly noted, Detective Purdue testified that Ms. Renfro positively identified Tressler's picture as the same woman she saw in the car. Therefore, despite the slight variations Simmons notes between Ms. Renfro's *1116 description and Tressler's actual appearance, the trial court properly concluded that the portion of the affidavit regarding Ms. Renfro's description of Tressler was not misstated.
Next, Simmons alleges an inaccuracy in the portion of the affidavit that indicates that Detective Brewer personally observed several visible stains consistent with dried blood in the back of Simmons' vehicle. This is because the trial judge personally examined the sheet and found no blood. While there does appear to be an inconsistency between Detective Brewer's and the trial judge's observations of the sheet, the record does not refute Detective Brewer's testimony that he personally observed blood stains prior to preparing the warrant. The trial court found that the officer's observations and conclusions were not unreasonable considering the circumstances of the observations.
The trial court also noted that "[t]he observation of the blood-stained sheet may be superfluous under Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419" (1970), because "the initial Fourth Amendment intrusion was the seizure of the vehicle, and a proper analysis would be to review of [sic] the facts as they existed at that time." In Chambers, the United States Supreme Court stated:
For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.
399 U.S. at 52, 90 S.Ct. 1975. We find no error in the rulings of the trial court.
Simmons further alleges that the testimony as to when Detective Brewer signed the affidavit and when the magistrate issued the search warrant indicates that Detective Brewer never saw the vehicle before signing the affidavit. The trial court acknowledged that although there was "some question as to when the affidavit and warrant were presented to the magistrate," the trial court did "not find the discrepancy in time [to be] any indication of untoward action on behalf of the Lake County[ ] Sheriff's Department." Considering the totality of the circumstances and the deference we give to the trial court regarding factual determinations, we find no error. Based on the analysis concerning Simmons' statements and the search of his vehicle, we also find no merit to Simmons' contention that the arrest of Simmons was the result of police misconduct.

IV. Testimony of Defense Expert in Eyewitness Identification
In his next issue on appeal, Simmons argues that the trial court erred in refusing to admit Dr. John Brigham's expert testimony concerning the psychological factors that contribute to erroneous witness identifications when law enforcement officers use suggestive techniques.
In Johnson v. State, 438 So.2d 774 (Fla. 1983), this Court found no error in a trial court's refusal to allow such expert testimony:
A trial court has wide discretion concerning the admissibility of evidence and the range of subjects about which an expert can testify. Jent v. State, 408 So.2d 1024 (Fla.1981), cert. denied, 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982); Johnson v. State, 393 So.2d 1069 (Fla.1980), cert. denied, 454 U.S. *1117 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981). Expert testimony should be excluded when the facts testified to are of such nature as not to require any special knowledge or experience in order for the jury to form its conclusions. We hold that a jury is fully capable of assessing a witness' ability to perceive and remember, given the assistance of cross-examination and cautionary instructions, without the aid of expert testimony.
Id. at 777 (citation omitted). Subsequently, in McMullen v. State, 714 So.2d 368 (Fla.1998), this Court considered whether the same expert witness, Dr. Brigham, was improperly excluded as a witness when offering similar testimony. This Court concluded "that the admission of such testimony is within the discretion of the trial judge and that . . . the trial judge did not abuse that discretionary authority by refusing to allow the introduction of the expert testimony." Id. at 369. This Court stated in McMullen that Florida follows the "discretionary" view articulated in Johnson regarding the admissibility of expert witness testimony concerning the reliability of eyewitness testimony. Id. at 370-71. Dr. Brigham stated in his proffered testimony in the present case that he would testify at trial to issues similar to those in McMullen. Under our case law we conclude the trial judge did not abuse his discretion in disallowing Dr. Brigham's testimony.

V. State's Entomology Expert
Simmons next argues that because Dr. Hogsette, the State's expert in the life cycle of flies, was not qualified as a forensic entomologist, the trial court erred in allowing him to testify regarding the approximate time of Tressler's death.
A trial judge has the discretion to determine if a witness's qualifications render him or her an expert, and this determination will not be overturned absent clear error. Johnson, 438 So.2d at 777 (noting a trial court's wide discretion regarding evidence admissibility and expert testimony). We conclude that the trial court did not commit error in allowing Dr. Hogsette to utilize his knowledge of the life cycle of flies and relate this knowledge to the estimated time of Tressler's death. During trial, Dr. Hogsette testified concerning his experience in entomology and his involvement in other murder cases, stating that other courts had recognized him as an expert in the field of entomology and the life cycle of flies. He had worked on forensic cases since the 1970s, utilizing his expert knowledge in determining the age of corpses, and he explained that the work he has performed on flies involved the same principles that a forensic entomologist would use. Of course, there was also other evidence presented during trial, such as the eyewitness testimony of the events preceding the murder, that placed Tressler's death during the time period opined by Dr. Hogsette. We find that the trial court did not err in allowing Dr. Hogsette to testify.

VI. Identification of Tressler and Simmons' Vehicle
Next, Simmons claims the trial court erred in denying Simmons' motion to exclude or preclude the identification of Simmons' vehicle.[14] He argues that the procedures *1118 used to identify Simmons' vehicle and Tressler were unnecessarily suggestive because Ms. Renfro was shown only one photograph and one vehicle to identify Tressler and Simmons' vehicle, and Mr. Montz was shown only one vehicle over a year after he first viewed it to identify Simmons' vehicle.[15]
"The primary evil to be avoided in the introduction of an out-of-court identification is a very substantial likelihood of misidentification." Grant v. State, 390 So.2d 341, 343 (Fla.1980) (citing Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). In Grant, this Court held that "a suggestive confrontation procedure, by itself, is not enough to require exclusion of the out-of-court identification; the confrontation evidence will be admissible if, despite its suggestive aspects, the out-of-court identification possesses certain features of reliability." 390 So.2d at 343 (citing Manson v. Brathwaite, 432 U.S. 98, 110, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). Therefore, the test for whether a suggestive identification procedure should be excluded has two prongs: "(1) did the police employ an unnecessarily suggestive procedure in obtaining an out-of-court identification; [and] (2) if so, considering all the circumstances, did the suggestive procedure give rise to a substantial likelihood of irreparable misidentification." Id.
In Neil, the United States Supreme Court held that the factors a court should consider to determine the likelihood of misidentification include
the opportunity of the witness to view [the person or object] at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the [person or object], the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
Neil, 409 U.S. at 199-200, 93 S.Ct. 375. These factors have often been applied to cases involving the identification of defendants, see, e.g., Fitzpatrick v. State, 900 So.2d 495, 518 (Fla.2005), and this Court has held that these factors also apply to the identification of physical evidence. Dennis v. State, 817 So.2d 741, 760 (Fla. 2002) ("The factors to be considered in the determination of whether the identification of the vehicle was reliable are all comparable to factors considered in a witness's identification of a suspect."); Pittman v. State, 646 So.2d 167, 171 (Fla.1994) (holding that the Neil factors applied to identification of the defendant's wrecker).
We agree with Simmons that the methods employed by law enforcement in this case were highly suggestive because only *1119 one photograph and one vehicle were shown to witnesses, resulting in an affirmative answer to the first prong of the out-of-court identification analysis. See Washington v. State, 653 So.2d 362, 365 (Fla.1994) (holding that "the showing of a single photo [is] unduly suggestive"); Way v. State, 502 So.2d 1321, 1323 (Fla. 1st DCA 1987) (stating that the "use of a single photograph is one of the most suggestive methods of identification possible and is impermissibly suggestive under most circumstances"). However, we find no error in the rulings of the trial court that, considering the totality of the circumstances, the procedures did not "give rise to a substantial likelihood of irreparable misidentification," and we answer the second prong of the out-of-court identification analysis in the negative concerning both Ms. Renfro's and Mr. Montz's identifications.

A. Ms. Renfro's Identifications of Tressler and Simmons' Vehicle
Ms. Renfro testified at trial that she saw a white car slow down at a red light when a woman tried to climb out, screaming, "Help me, help me, please." She stated that the woman looked directly at her with fear in her eyes. As Ms. Renfro approached the car, yelling at the driver to stop, the car sped off, and she got in her van and chased after the car until she lost the car. Ms. Renfro testified that she thought the car was a Chevrolet Corsica, but she didn't "really know [her] cars too well, just the body style reminded [her] of a Corsica." On December 4, 2001, three days later, Ms. Renfro wrote a statement describing the events and people she had witnessed, stating that the woman she saw was an older woman with "shorter, pinned up" brown hair and a white T-shirt. That same day, Detective Perdue showed her one picture of Tressler, which she was able to identify right away. Six days later, on December 10, Ms. Renfro met Detective Perdue at the sheriff's office to view a car parked in the sallie port, which she identified as the car she had seen on the night of December 1. She testified at the hearing that she was sure it was the same car because of the flag on the side window, a patriotic sticker in the rear window, and the car's blue interior.
Based on these facts, we agree that showing Ms. Renfro one picture of Tressler and one vehicle was "unduly suggestive." See Washington, 653 So.2d at 365.
However, . . . a pretrial identification obtained from suggestive procedures is not per se inadmissible, but may be introduced into evidence if "found to be reliable and based solely upon the witness' independent recollection . . . at the time of the crime, uninfluenced by the intervening illegal confrontation."
Id. (quoting Edwards v. State, 538 So.2d 440, 442 (Fla.1989)). Ms. Renfro had an abundance of time and good lighting conditions to view the victim and the car. She also gave written descriptions of Tressler and the vehicle she saw the night of December 1 before viewing the single photograph of Tressler or Simmons' vehicle in the sallie port. Because of the timing of the descriptions, we find no error in the trial court's conclusion that they were the result of Ms. Renfro's independent recollection, "uninfluenced by the intervening illegal confrontation." Id. We further conclude, using the Neil factors, that Ms. Renfro had adequate opportunity to view the woman and car she saw on the night of December 1; her descriptions were sufficiently accurate; she was certain of what she saw on the night of December 1; and *1120 the length of time between the crime and her identifications was only a matter of days. Therefore, any discrepancies between Ms. Renfro's descriptions and what Tressler and Simmons' car actually looked like, such as Simmons' claim that Ms. Renfro's description of Tressler's hair was inaccurate, "were the proper subject of cross-examination, but not sufficient to amount to a bar to admissibility." Dennis, 817 So.2d at 761.

B. Mr. Montz's Identification of Simmons' Vehicle
Mr. Montz's identification of Simmons' vehicle did not occur until a year after he initially described to Detective Perdue the car he witnessed, when Detective Perdue showed him a videotape of Simmons' car. Mr. Montz then identified the car without any hesitancy or uncertainty, and stated that he was sure it was the same car because of its color, the number of doors, the spoked rims, the amount of dirt, and its two dents. He also recalled the flag hanging from the car's window.[16] The trial court found that when applying the Neil factors, the lapse in time between when Mr. Montz initially saw the car and when he was able to identify it would "weigh in favor of finding that there [was] a substantial likelihood of misidentification." However, the trial court held that after examining the totality of the circumstances, there existed no substantial likelihood for misidentification.
First, as with Ms. Renfro, we conclude that Detective Perdue's showing Mr. Montz a videotape of only one vehicle constituted an unduly suggestive identification procedure under the first prong of the out-of-court identification analysis. Further, we agree with the trial court that the length of time that passed between Mr. Montz's first viewing of the car and his identification of it a year later could result in a substantial likelihood of misidentification.
However, considering the other Neil factors, we conclude that the trial court did not err in finding that Simmons has not satisfied the second prong of the test for whether a suggestive identification should be excluded. First, Mr. Montz had an adequate opportunity to view the car the night he witnessed it because the area was well lighted and there was nothing blocking his view. Second, Mr. Montz's degree of attention was high, judging from the accuracy of his description of the car, and his level of certainty was high as well.

VII. The Constitutionality of Florida's Death Penalty Statute
In his next issue on appeal, Simmons argues that Florida's death penalty statute, section 921.141, Florida Statutes (2003), is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We have previously addressed this contention on direct appeal and have concluded that there is no basis for declaring Florida's statutory scheme facially unconstitutional. See, e.g., Lawrence v. State, 846 So.2d 440, 451 (Fla. 2003), cert. denied, 540 U.S. 952, 124 S.Ct. 394, 157 L.Ed.2d 286 (2003); Butler v. State, 842 So.2d 817, 834 (Fla.2003). Further, in this case, by use of a special interrogatory verdict, the jury expressly *1121 and unanimously found all of the aggravating factors later relied upon by the trial court to impose a death sentence. See Ring, 536 U.S. at 609, 122 S.Ct. 2428 (finding that the Sixth Amendment right to a jury trial precludes a procedure by which a sentencing judge alone and without a jury finds aggravating factors sufficient to invoke the death penalty); see also Everett v. State, 893 So.2d 1278, 1282 (Fla.2004) (rejecting the defendant's Ring claim because the jury unanimously recommended death, and one of the aggravating factors was that the murder was committed during the course of a sexual battery or burglary, crimes of which the jury also found the defendant guilty), cert. denied, 544 U.S. 987, 125 S.Ct. 1865, 161 L.Ed.2d 747 (2005); Caballero v. State, 851 So.2d 655, 663-64 (Fla.2003) (rejecting a Ring claim on direct appeal where one of the aggravating circumstances the judge considered was that the defendant committed the murder during the commission of a burglary and kidnapping).

VIII. Aggravators
In his final argument on appeal, Simmons argues that the trial court erred in finding the evidence sufficient to establish three aggravators of a prior violent felony, the murder being committed during the course of kidnapping and sexual battery, and HAC.

A. Previous Felony Conviction Involving the Use or Threat of Violence to the Person
Simmons had previously been convicted of aggravated assault on a law enforcement officer. Further, section 921.141(5)(b), Florida Statutes (2001), states that an assault involving the threat of violence qualifies as an aggravating factor for purposes of imposing the death penalty. The probable cause affidavit from that case was read to the jury during the penalty phase of this case, and it stated that Simmons' car appeared to deliberately veer into oncoming traffic, forcing a police officer to drive completely off the road to avoid a head-on collision. Simmons argues that because his prior conviction involved a drunk driving incident in which a police officer only thought that Simmons was swerving at him, there was no intent involved and, therefore, this conviction cannot be considered an aggravating factor. However, according to the probable cause affidavit introduced into evidence, Simmons' actions caused the officer to feel threatened and to take evasive measures to avoid a head-on collision. Based on this evidence, the penalty phase jury found that the State proved this aggravating circumstance. Similarly, we conclude that this previous felony conviction was found as an appropriate aggravating factor.

B. Murder Was Committed During the Commission of or Attempted Commission of Kidnapping and Sexual Battery
Simmons next argues that the evidence does not support the finding that the murder occurred during the commission of kidnapping and sexual battery. Simmons was found guilty during the guilt phase of kidnapping and sexual battery using force likely to cause serious injury based on the evidence of sexual injury found on the victim's body. These facts, coupled with the eyewitness testimony placing Tressler in Simmons' car screaming for help the night of December 1, 2001, constitute substantial competent evidence to support the trial court's finding that Simmons committed the murder while engaged in a kidnapping *1122 and sexual battery under section 921.141(5)(d), Florida Statutes (2001).

C. HAC
The HAC aggravator applies "only in torturous murdersthose that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another." Rose v. State, 787 So.2d 786, 801 (Fla.2001) (quoting Guzman v. State, 721 So.2d 1155, 1159 (Fla.1998)). Further, this Court has previously "upheld HAC in beating deaths" presenting similar circumstances to those involved herein. Lawrence v. State, 698 So.2d 1219, 1222 (Fla. 1997); see also Dennis, 817 So.2d at 766 (trial court's finding of HAC was supported by evidence that the victims suffered skull fractures as the result of a brutal beating and that the victims were conscious for at least part of the attack); Bogle v. State, 655 So.2d 1103, 1109 (Fla. 1995) (trial court's finding of HAC was supported by evidence that the victim was struck seven times in the head and the medical examiner testified that the victim was alive at the time of the infliction of most of the wounds); Wilson v. State, 493 So.2d 1019, 1023 (Fla.1986) (trial court's finding of HAC was supported by evidence that victim was brutally beaten while attempting to fend off blows to the head before he was fatally shot).
In this case, Simmons argues that because it is possible that the first blow to Tressler's head rendered her unconscious, HAC should not apply. However, Dr. Gulino, the medical examiner, described numerous wounds that, in his opinion, were inflicted prior to Tressler's becoming unconscious. Further, Tressler suffered approximately twenty-five defensive wounds and other nonfatal stab wounds and blunt trauma injuries. Additionally, Dr. Gulino unequivocally stated that the injury to Tressler's anus occurred prior to her death because of the extensive bruising and laceration. Also, Ms. Renfro testified that Tressler appeared terrified when she saw her in Simmons' car the night she was last seen. Based upon all of this evidence, we uphold the trial court's finding of HAC as an aggravating circumstance.

IX. Proportionality
The Court performs a proportionality review to prevent the imposition of "unusual" punishments contrary to article I, section 17 of the Florida Constitution. See Tillman v. State, 591 So.2d 167, 169 (Fla.1991). "The death penalty is reserved for `the most aggravated and unmitigated of most serious crimes.'" Clark v. State, 609 So.2d 513, 516 (Fla.1992) (quoting State v. Dixon, 283 So.2d 1, 7 (Fla.1973)). In deciding whether death is a proportionate penalty, we consider the totality of the circumstances of the case and compare the case with other capital cases. See Urbin v. State, 714 So.2d 411, 417 (Fla.1998). However, this proportionality review "is not a comparison between the number of aggravating and mitigating circumstances." Sexton v. State, 775 So.2d 923, 935 (Fla.2000) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)).
In this case, the trial court found three aggravating circumstances: (1) A previous conviction of a felony involving the use or threat of violence to a person; (2) the murder was committed in the course of a kidnapping and sexual battery; and (3) HAC. The court found no statutory mitigators, but did find several nonstatutory mitigators that were given either some or minimal weight. This Court has stated *1123 that HAC is one of the most serious aggravators in the statutory sentencing scheme. See Morton v. State, 789 So.2d 324, 331 (Fla.2001); Larkins v. State, 739 So.2d 90, 95 (Fla.1999). Recently, in Boyd v. State, 910 So.2d 167 (Fla.2005), cert. denied, ___ U.S. ___, 126 S.Ct. 1350, 164 L.Ed.2d 63 (2006), this Court concluded that the death penalty was proportionate where the trial court considered and weighed two aggravating factors (HAC and that the murder was committed while the defendant was committing or attempting to commit kidnapping and sexual battery) against one statutory mitigator (that the defendant had no significant prior criminal history, which the trial court afforded medium weight) and five nonstatutory mitigators (including that the defendant came from a good family and showed remorse for his actions). See also Dessaure v. State, 891 So.2d 455, 472-73 (Fla.2004) (death sentence was proportionate where, although the rape kit was negative, the defendant inflicted a total of fifty-three wounds, including multiple lethal stab wounds to the torso and neck; the trial court found that the aggravators of a previous conviction of a violent felony, prior felony conviction, that the murder was committed during a burglary, and HAC outweighed the "age" statutory mitigator and the nonstatutory mitigating factors of caring parents, family background, capacity to form personal relationships, and behavior in court). In light of the totality of the circumstances of this case as compared to the facts of other capital cases, we find the death penalty to be proportionate.

CONCLUSION
For the reasons expressed above, we affirm Simmons' convictions and sentences, including the sentence of death.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, CANTERO, and BELL, JJ., concur.
PARIENTE, C.J., specially concurs with an opinion, in which ANSTEAD and CANTERO, JJ., concur.
WELLS, J., concurs with an opinion.
BELL, J., specially concurs with an opinion.
QUINCE, J., concurs in result only.
PARIENTE, C.J., specially concurring.
I concur in the majority opinion, but write separately on Issue IV, which concerns the exclusion of expert testimony on eyewitness identifications. Twenty-three years ago, this Court, addressing one of six guilt-phase claims in a capital appeal, issued what has become the seminal opinion on this issue in Florida. Applying an "abuse of discretion" review standard, we affirmed the exclusion of expert testimony on the reliability of eyewitness identification. See Johnson v. State, 438 So.2d 774, 777 (Fla.1983). We stated:
A trial court has wide discretion concerning the admissibility of evidence and the range of subjects about which an expert can testify. Expert testimony should be excluded when the facts testified to are of such nature as not to require any special knowledge or experience in order for the jury to form its conclusions. We hold that a jury is fully capable of assessing a witness' ability to perceive and remember, given the assistance of cross-examination and cautionary instructions, without the aid of expert testimony.
Id. (citations omitted).
In so holding, we signaled to trial judges that expert testimony in this area is unnecessary *1124 because the assessment of eyewitness identification is within the common experience of jurors. With one exception, in every case since Johnson in which we have addressed this issue, the trial courts excluded expert testimony on the factors affecting eyewitness identification testimony, and this Court affirmed, relying on the final sentence from Johnson excerpted above, either alone or within the longer passage. See McMullen v. State, 714 So.2d 368, 370 (Fla.1998); Lewis v. State, 572 So.2d 908, 911 (Fla.1990); Hooper v. State, 476 So.2d 1253, 1257 (Fla.1985). In addition, this Court relied on the determination in Johnson that juries do not need "the aid of expert testimony" to assess eyewitness identification testimony in affirming the refusal of the trial court to authorize payment of costs for an indigent defendant to retain an expert. See Espinosa v. State, 589 So.2d 887, 893 (Fla. 1991), rev'd on other grounds, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). In the one case reviewed by this Court in which expert testimony in this area was admitted, we summarily upheld the trial court's limitation on its scope, again relying on Johnson. See Rogers v. State, 511 So.2d 526, 530 (Fla.1987).
In the years that have passed since we stated our belief in 1983 that jurors can accurately assess eyewitness identifications without the aid of expert testimony as they do most other evidence, we have learned that quite the opposite is often true. For example, common sense would lead us to believe that greater certainty by an eyewitness in making an identification corresponds to greater accuracy. Yet research shows that a witness's degree of certainty correlates weakly, at best, with the accuracy of the identification. See Elizabeth Loftus & James Doyle, Eyewitness Testimony: Civil and Criminal § 3-12, at 67 (3d ed. 1997) ("The consensus of the literature that deals with [whether eyewitness confidence is an indication of eyewitness accuracy] seems to indicate that eyewitness confidence is not a very good indicator of eyewitness accuracy."). In fact, the "certainty an eyewitness expresses in his identification can be a misleading indicator of the identification's accuracy." Gary L. Wells, Eyewitness Identifications: Scientific Status, in Science In the Law: Social and Behavioral Science Issues 391, 412 (David L. Faigman et al. eds., 2002). Other features of eyewitness unreliability, such as difficulty identifying persons of another race, have also become well established. See Loftus & Doyle, supra, § 4-9, at 86; Wells, supra, at 404. A 2002 report by the Illinois Governor's Commission on Capital Punishment reflects that "[t]he fallibility of eyewitness testimony has become increasingly well-documented in both academic literature and in courts of law." Report of the Governor's Commission on Capital Punishment 31 (2002), available at http://state.il.us/defender/report.pdf. Similarly, the North Carolina Actual Innocence Commission organized by Chief Justice I. Beverly Lake, Jr., of the North Carolina Supreme Court "chose eyewitness identification as its first topic of study because research has identified misidentification as the leading factor in the wrongful conviction of those exonerated nationally by DNA evidence." Christine C. Mumma, The North Carolina Actual Innocence Commission: Uncommon Perspectives Joined by a Common Cause, 52 Drake L.Rev. 647, 652 (2004).
Section 90.702, Florida Statutes (2005), titled "Testimony by experts," provides:
If scientific, technical, or other specialized knowledge will assist the trier of *1125 fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion; however, the opinion is admissible only if it can be applied to evidence at trial.
Focusing on this provision, Justice Anstead wrote separately in McMullen to urge trial courts to admit expert testimony on eyewitness identifications when such testimony would be helpful to the jury:
In this case I would approve of the discretionary use of expert testimony about psychological factors that may affect eyewitness identification . . . to give effect to the intent expressed in section 90.702. Further, . . . while the question of admissibility of such expert testimony should be left to the sound discretion of the trial judge, I would attach the . . . caveat that the trial judge must exercise his or her discretion in furtherance of section 90.702's "helpfulness" standard. In considering a proffer of such evidence the trial court should be aware that it has the discretion to admit the evidence. It should be careful in assessing the qualifications of the expert presented as well as in making an evaluation of the helpfulness of the proffered testimony compared to the risk that it may cause juror confusion.
714 So.2d at 380-81 (Anstead, J., concurring in part and dissenting in part).
Since McMullen, several courts have recognized that the research results fall outside common assumptions about eyewitness identification testimony. For example, in United States v. Mathis, 264 F.3d 321, 340-42 (3rd Cir.2001), the United States Court of Appeals for the Third Circuit concluded that the jury would have been illuminated by proffered expert testimony concerning the effect of prior viewings of a suspect's image, the poor correspondence of a witness's confidence to the reliability of an identification, and the effect of weapon focus. The Third Circuit concluded that "testimony of this sort, with its accompanying level of scientific detail, would not simply duplicate jurors' intuitions or common sense, and such principles seem difficult to establish indirectly through cross-examination." Id. at 341. For this reason, Mathis held that the trial court abused its discretion in excluding expert testimony on the "double identification" effect, as well as on the relationship between eyewitness confidence and accuracy and the effect of the presence of a weapon on accuracy. Id. at 341-42.
Similarly, the United States Court of Appeals for the Sixth Circuit, applying an abuse of discretion standard, ruled that a trial court erred in excluding expert testimony on eyewitness identifications without first determining whether the testimony would be helpful to the jury. See United States v. Smithers, 212 F.3d 306, 315 (6th Cir.2000). The court stated that the trend in favor of admission of expert testimony is "not surprising in light of modern scientific studies which show that, while juries rely heavily on eyewitness testimony, it can be untrustworthy under certain circumstances." Id. at 311-12. The Sixth Circuit cited a "plethora" of authorities supporting this view, including one suggesting that "`jurors are unaware of several scientific principles affecting eyewitness identifications'. . . [and], because many of the factors affecting eyewitness impressions are counter-intuitive, many jurors' assumptions about how memories are created are actively wrong." Id. at 312 n. 1 (citation omitted) (quoting Roger V. Handberg, Expert Testimony on Eyewitness *1126 Identification: A New Pair of Glasses for the Jury, 32 Am.Crim. L.Rev. 1013, 1022 (1995)).
In Smithers, the Sixth Circuit held that expert eyewitness identification testimony "should be admitted ... when there is no other inculpatory evidence presented against the Defendant with the exception of a small number of eyewitness identifications." 212 F.3d at 317. The Georgia Supreme Court has reached a similar conclusion:
Where eyewitness identification of the defendant is a key element of the State's case and there is no substantial corroboration of that identification by other evidence, trial courts may not exclude expert testimony without carefully weighing whether the evidence would assist the jury in assessing the reliability of eyewitness testimony and whether expert eyewitness testimony is the only effective way to reveal any weakness in an eyewitness identification.
Johnson v. State, 272 Ga. 254, 526 S.E.2d 549, 552-53 (2000) (footnote omitted).
Mistaken identity is the chief cause of wrongful convictions. See Edward Connors et al., Convicted by Juries, Exonerated by Science: Case Studies in the Use Of DNA Evidence to Establish Innocence After Trial (1996) (finding that twenty-four out of twenty-eight cases of postconviction exoneration based on DNA testing were due in great part to mistaken eyewitness identifications); Connie Mayer, Due Process Challenges To Eyewitness Identification Based On Pretrial Photographic Arrays, 13 Pace L.Rev. 815, 819 (1994) ("[S]tudies have shown that approximately fifty percent of those wrongly convicted were convicted based on eyewitness identification evidence."). By bringing to light research findings on factors affecting an eyewitness identification, expert testimony can assist the trier of fact, the criterion for admission of expert testimony under section 90.702.
Our decision in Johnson does not bar the introduction of expert testimony on eyewitness identifications. It is now clear that such testimony can assist the jury in assessing guilt in certain cases, especially where, as some courts have recognized, the only inculpatory evidence is eyewitness testimony. Accordingly, I encourage trial courts to truly exercise their discretion as to the admission of this testimony. Trial judges should consider, as they do with other expert testimony, whether the testimony would assist the jury, i.e., whether it would introduce relevant considerations as to accuracy that could not otherwise be brought to light via cross-examination, jury instructions, or the jurors' common sense. As the research demonstrates and courts increasingly recognize, expert testimony in this area can be a powerful tool in helping the criminal justice system achieve its goal of convicting the guilty while acquitting the innocent.
ANSTEAD and CANTERO, JJ., concur.
WELLS, J., concurring.
I concur in the majority opinion. I write separately to comment upon Chief Justice Pariente's concurring opinion in respect to expert opinion on eyewitness identification, with which I do not agree.
Rather, I agree with the decision in United States v. Smith, 122 F.3d 1355 (11th Cir.1997), approving United States v. Thevis, 665 F.2d 616 (5th Cir.1982). In Thevis, the court stated that "[t]o admit such testimony in effect would permit the proponent's witness to comment on the *1127 weight and credibility of opponents' witnesses and open the door to a barrage of marginally relevant psychological evidence." Id. at 641. I have additional serious concerns about what makes a person a qualified expert who can present testimony about whether a particular eyewitness is reliable. Furthermore, it is my view that expert testimony on the general credibility of eyewitness testimony only serves to cast general doubt as to witnesses not relevant to the specific situation of a particular trial. Again, as the court said in Thevis, "the problems of perception and memory can be adequately addressed in cross-examination and ... the jury can adequately weigh these problems through common-sense evaluation." Id.
Moreover, such testimony in Florida courts would have to be Frye[17] tested, similar to what we required in Hadden v. State, 690 So.2d 573 (Fla.1997). Frye testing raises additional questions. How is such an expert's opinion peer reviewed? How does the opinion become generally accepted? What is the relevant scientific community?
An excellent summary of the case law on this subject is gathered in Challenge to Eyewitness Identification Through Expert Testimony, 35 Am.Jur. Proof of Facts 3d 1 (1996 & Supp. 2005), by The Honorable D. Duff McKee.
BELL, J., specially concurring.
I agree with Justice Pariente that there is no per se rule of law against the admission of eyewitness expert testimony. I also agree with her that guidance should be given to trial courts on how to exercise their discretion in deciding whether to admit such testimony. In an effort to provide tangible guidance, I offer four guiding principles and five factors a trial court should consider when determining whether or not eyewitness expert testimony should be admitted in any particular criminal case.[18]
Four Guiding Principles
1. Whether to allow expert testimony on the issue of eyewitness identification is left to the sound discretion of the trial judge.
2. As with other witnesses, evaluating the credibility and reliability of eyewitnesses is generally for the jury to determine, without the help of eyewitness experts. Effective cross-examination, presentation of contradictory evidence, sound argument of counsel, and jury instructions are all effective, efficient and generally sufficient means of assisting the jury in properly fulfilling its critical function as fact-finder.
3. Expert testimony on eyewitness identification will be necessary in very limited circumstances.
4. If eyewitness expert testimony is deemed necessary, it must be "Frye tested."[19] The expert's opinion must rest upon research and principles that are generally accepted in the relevant scientific community.

*1128 Factors to Consider in a Particular Case

If all of the following factors are present in a particular case and the expert testimony is deemed admissible under Frye, the testimony should be admitted if:
(a) Identification of the defendant is a critical, disputed issue in the case; and
(b) The state's case essentially rests upon the credibility of eyewitness testimony; and
(c) There is little or no other evidence to independently establish that the defendant is the person who committed the crime; and
(d) The expert testimony addresses a specific circumstance of the eyewitness identification and provides a particularized explanation which will assist the jury in sorting out the facts; and
(e) The defendant maintains that he was not present when the offense was committed and advances an alibi.
NOTES
[1] The sentence for sexual battery was to run consecutive to the sentence for kidnapping, and the sentence for kidnapping was to run consecutive to the sentence of death for first-degree murder.
[2] Lacerations occur due to an impact with a blunt force, as opposed to a cut from a sharp object, such as a knife.
[3] This evidence included a vial of Tressler's blood, hairs from her hand, her clothing, insect larvae, and a sexual assault kit.
[4] Dr. Hogsette explained that there are three larval instar stages, and the larvae taken from Tressler's body were in the first and second instar stage.
[5] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[6] Tressler lived in a trailer without plumbing behind the Oasis bar; she had to wash herself with a garden hose outside.
[7] The detectives took turns leaving the room during the interview to check on the status of Simmons' car, which had been towed to the LCSO while detectives were interviewing Simmons. After the police obtained a search warrant, Detective Perdue watched the technicians perform a presumptive test on a suspected blood stain in the car, which indicated that it was blood.
[8] The grand jury indictment charged Simmons with murder in the first-degree due to the murder being from a premeditated design or while engaged in the felony of sexual battery. The jury simply found Simmons guilty of first-degree murder without differentiating between the two.
[9] These witnesses were Sergeant Craig Leslie and Ashley Simmons. Sergeant Leslie testified that Simmons had one incident of disciplinary confinement because he engaged in a fight with another inmate, which was not surprising to Sergeant Leslie considering Simmons' stay in jail of a year and nine months at that time. Ashley Simmons testified that Simmons came from a loving, close-knit family, and he was always helping other people, which "got him in the position he's in today."
[10] Spencer v. State, 615 So.2d 688 (Fla.1993).
[11] The mitigating circumstances rejected by the trial court were: (1) Simmons' manifestation of appropriate behavior while at the jail (not proven); (2) residual or lingering doubt that Simmons is guilty and that Simmons' behavior is inconsistent with the psychological profile of a murderer (not proven and not admissible to prove innocence because it is inadmissible to prove guilt); and (3) the prosecution of Simmons was partially predicated upon circumstantial evidence (not mitigating).
[12] We find that Simmons' claim that the State's witness on mtDNA testing was not qualified to testify is waived because defense counsel failed to object to his qualifications at trial. See Bertolotti v. Dugger, 514 So.2d 1095, 1096 (Fla.1987) ("In order to preserve an issue for appellate review, the specific legal argument or ground upon which it is based must be presented to the trial court."). We also find that Simmons' claim that the prosecutor made improper remarks concerning the mtDNA evidence on Simmons' car seat is waived because Simmons' counsel did not properly brief this issue for appeal. See Coolen v. State, 696 So.2d 738, 742 n. 2 (Fla.1997) (stating that a failure to fully brief and argue points on appeal "constitutes a waiver of these claims"); see also Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990) ("The purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived."). Likewise, we conclude that Simmons' argument that the prosecutor engaged in misconduct that rose to the level of preventing a fair trial is waived because of its vagueness.
[13] The State correctly points out in its brief that Simmons' counsel adopts arguments made in the court below in her initial brief to this Court. This practice does not preserve an issue for review by an appellate court. See Duest, 555 So.2d at 852 (stating that claims are deemed waived if a party merely makes reference to arguments made in a lower court).
[14] Simmons' brief states that arguments made at the trial court level regarding Simmons' motion to suppress are incorporated by reference into his brief on this appeal. "Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived." Duest, 555 So.2d at 852. Therefore, any arguments not expressly included in Simmons' brief to this Court are not considered in this appeal.
[15] Initially, we reject Simmons' arguments that Ms. Renfro's and Mr. Montz's identifications violated Simmons' Sixth Amendment right to counsel. Under Powell v. Alabama, 287 U.S. 45, 57, 53 S.Ct. 55, 77 L.Ed. 158 (1932), defendants have a right to counsel at critical stages of their cases, including the time between arraignment and the beginning of trial. As the trial court noted and the State argues to this Court, the two cases Simmons cites for his proposition, United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), both involved defendants participating in post-indictment lineups. In Simmons' case, Simmons did not participate in the identifications of Tressler or his vehicle. In fact, Ms. Renfro's identification of Tressler's photograph occurred before Simmons was arrested.
[16] Simmons argues that Mr. Montz stated that the vehicle he identified was the same vehicle as the one he witnessed a year earlier, except for the dents, dirt, wheels, and trim. However, the record states that Mr. Montz was sure it was the same car because of its color, the number of doors, the spoked rims, the amount of dirt, and its two dents.
[17] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[18] I draw these principles and factors from Florida law as well as from the synthesis of case law from across this nation by The Honorable D. Duff McKee in his excellent article, Challenge to Eyewitness Identification Through Expert Testimony, 35 Am.Jur. Proof of Facts 3d 1 (1996 & Supp. 2005). As does Justice Wells, I commend Judge McKee's work to any judge or trial attorney confronting this important question.
[19] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923). "Florida courts follow the test set out in [Frye]." (Castillo v. E.I. Du Pont de Nemours & Co., Inc., 854 So.2d 1264, 1268 (2003)). "This test requires that the scientific principles undergirding this evidence be found by the trial court to be generally accepted by the relevant members of its particular field." Id. (quoting Hadden v. State, 690 So.2d 573, 576 (Fla.1997)). "We have recently defined `general acceptance' to mean acceptance by a clear majority of the members of the relevant scientific community, with consideration by the trial court of both the quality and quantity of those opinions." Hadden, 690 So.2d at 576 n. 2 (citing Brim v. State, 695 So.2d 268 (Fla.1997)).