# Supreme Court of Florida

_____

No. SC14-2314
_____

**ERIC LEE SIMMONS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[December 22, 2016]

PER CURIAM.

Eric Lee Simmons appeals the death sentence imposed after a resentencing proceeding. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we vacate the sentence and remand for resentencing based on Hurst v. State (Hurst), 202 So. 3d 40 (Fla. 2016). Although the jury was provided an interrogatory verdict form in this case, the jury did not unanimously conclude that the aggravating factors were sufficient, or that the aggravating factors outweighed the mitigating circumstances. These findings are necessary pursuant to our decision in Hurst.

## FACTS AND PROCEDURAL BACKGROUND

Simmons, age twenty-seven at the time of the murder, was convicted of the December 2001 kidnapping, sexual battery, and stabbing and beating death in Lake County, Florida, of Deborah Tressler, a woman Simmons had befriended. Simmons was sentenced to death after a unanimous jury recommendation in the first penalty phase. Pursuant to section 921.141, Florida Statutes (2003), the trial court found three aggravating factors: prior violent felony; commission of murder during the commission of, or attempt to commit, a sexual battery, a kidnapping, or both; and that the murder was especially heinous, atrocious, or cruel. These were found by the trial court to outweigh eight nonstatutory mitigating circumstances identified by the court.

On direct appeal, this Court affirmed the convictions and death sentence. Simmons v. State, 934 So. 2d 1100 (Fla. 2006). Simmons then filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851. The motion was denied by the trial court, and Simmons appealed to this Court. Simmons also filed a petition for writ of habeas corpus alleging ineffective assistance of appellate counsel. We denied the petition for habeas relief and affirmed the denial of relief on all postconviction claims but one. We vacated the sentence of death and remanded for a new sentencing proceeding because trial counsel failed to fully investigate and present mitigating evidence regarding

Simmons's childhood and mental health. <u>Simmons v. State</u>, 105 So. 3d 475 (Fla. 2012).

At the conclusion of the new penalty phase, the jury returned a special interrogatory verdict indicating a unanimous finding that each of the three following aggravating factors was established beyond a reasonable doubt: (1) prior violent felony; (2) the murder was committed while Simmons was engaged in the commission of a sexual battery, a kidnapping, or both; and (3) the murder was especially heinous, atrocious, or cruel. The jury unanimously rejected the two proposed statutory mental health mitigating circumstances,[1] but six jurors found that a list of 29 nonstatutory mitigating circumstances was established by the greater weight of the evidence. The jury then issued an advisory sentence recommending death by a vote of eight to four.

After a <u>Spencer</u>[2] hearing, the trial court entered a sentencing order imposing a sentence of death. Simmons then filed a notice of appeal of the death sentence to

---

1. <u>See</u> § 921.141(6)(b), Fla. Stat. (the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance); § 921.141(6)(f), Fla. Stat. (substantial impairment of the defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law).

2. <u>Spencer v. State</u>, 615 So. 2d 688 (Fla. 1993).

this Court, raising six issues.[3]  The State filed a cross-appeal on the issue of the

trial court's order denying the State's objection to PET scan[4] evidence, but

subsequently filed a notice of voluntary dismissal of the cross-appeal.

Shortly before oral argument was held in this case, the United States

Supreme Court issued its decision in Hurst v. Florida (Hurst v. Florida), 136 S. Ct.

616 (2016), in which the Supreme Court held that the procedure by which

defendants are sentenced in capital cases in Florida was unconstitutional.  The

Supreme Court held that the jury, not the judge, must make all the critical findings

necessary for imposition of a sentence of death.  Hurst v. Florida, 136 S. Ct. at 622.

Because of the import of the Supreme Court's Hurst v. Florida decision in this

case, we ordered supplemental briefing to be filed prior to oral argument.  Further,

after the issuance of our decision on remand in Hurst, we permitted the parties to

file additional supplemental briefing.  We will discuss the impact of Hurst v.

---

3. Simmons contended that: (1) relevant expert mitigation was erroneously excluded at the second penalty phase; (2) the trial court erred in weighing mitigating evidence and erroneously rejected the statutory mitigator of substantial inability to conform conduct to the requirements of law; (3) the death sentence is disproportionate; (4) the jury was incorrectly instructed on the "especially heinous, atrocious, or cruel" aggravator; (5) the trial court erred in denying a mistrial after the jury heard that the penalty proceeding was a resentencing; and (6) Simmons is entitled to relief under Ring v. Arizona, 536 U.S. 584 (2002).

4. Positron Emission Tomography.

Florida and Hurst on Simmons's appeal after a more detailed review of the

underlying facts in this case.

The evidence presented during the guilt phase of trial established the

following:

> [O]n December 3, 2001, at approximately 11:30 a.m., John Conley, a Lake County Sheriff's Office (LCSO) deputy, discovered the body of Tressler in a large wooded area commonly used for illegal dumping.
> . . . .
> The medical examiner, Dr. Sam Gulino, observed the victim and the surroundings at the scene on December 3, 2001, with the victim lying on her left side with her right arm over her face. Dr. Gulino estimated the time of death was twenty-four to forty-eight hours before the body was discovered.
> Dr. Gulino performed an autopsy, which revealed numerous injuries. Tressler suffered some ten lacerations on her head, as well as numerous other lacerations and scrapes on her scalp and face. There was a very large fracture on the right side of her head, and her skull was broken into multiple small pieces that fell apart when the scalp was opened. Dr. Gulino opined that this injury and the injuries to her brain resulted in shock and ultimately Tressler's death. There was another fracture that extended along the base of the skull, resulting from a high-energy impact; bleeding around the brain; and bruises in the brain tissue where the fractured pieces of skull had cut the brain. There were numerous stab wounds on the neck, a long cut across the front and right portions of the neck, and other bruises and cuts. There was little bleeding from these injuries, indicating that the victim was already dead or in shock at the time of the injuries. The victim also suffered a stab wound in the right lower part of her abdomen that extended into her abdominal cavity and probably occurred after she received the head injury. There were also injuries to her anus with bruising on the right buttock extending into the anus, and the wall of the rectum was lacerated. These injuries were inflicted before death. Dr. Gulino opined that these injuries would be painful and not the result of consensual anal intercourse. The victim suffered numerous defensive wounds on her forearms and hands. There was also a t-shaped laceration on the scalp and an injury at the base of her right

- 5 -

index finger that was patterned, as if a specific type of object, like threads on a pipe, had caused it. Dr. Gulino opined that the attack did not occur at the exact spot where Tressler was found because of the lack of blood and disruption to the area, but stated that the position of Tressler's body was consistent with an attack occurring in that area.

On December 4, 2001, Robert Bedgood, a crime scene technician, collected evidence from Tressler's body during the autopsy. Dr. Jerry Hogsette testified that, based on the temperature in the area of Tressler's body and the development of the insect larvae taken from Tressler's body, Tressler had been killed between midnight on December 1, 2001, and early Sunday morning, December 2, 2001.

. . . .

Andrew Montz testified that late on the night of December 1, 2001, he was at the Circle K convenience store at the intersection of State Road 44 and County Road 437 in Lake County. Mr. Montz saw a white four-door car heading northbound on 437, stopping at the traffic light very slowly, when a woman opened the passenger door and screamed, "Somebody help me. Somebody please help me." The driver pulled the woman back into the car and ran the red light quickly. Mr. Montz stated that the woman was wearing a white T-shirt or pajama-type top. He was not able to see the driver and described the car as a Chevy Corsica/Ford Taurus-type car with a dent on the passenger side, black and silver trim on the door panel, and a flag hanging from the window. After viewing a videotape of a white 1991 Ford Taurus owned by Simmons a year later, Mr. Montz identified it as being the car he saw on December 1. Mr. Montz initially told lead Detective Stewart Perdue that the car had spoked rims, but after viewing spoked rims at an auto parts store, he concluded that the rims on the car he saw were not spoked.

Sherri Renfro testified that she was at the same Circle K as Montz between 11:30 and 11:40 p.m. with her sister-in-law's boyfriend, Shane Lolito. She also saw a white car slowly approach the red light, the passenger door open, and a woman yell for help while looking directly at Ms. Renfro. Ms. Renfro yelled at the driver to stop, but he did not, and Ms. Renfro got into her van and chased after the car. She traveled in excess of the speed limit, but was unable to get close to the car and eventually lost track of it. . . . Ms. Renfro subsequently identified Simmons' white Ford Taurus as the car she saw at the intersection, and she recognized the interior, the bumper

sticker, and the flag on the car. Ms. Renfro identified Tressler as the woman in the car when shown a photograph of her.

. . . .

Simmons waived his <u>Miranda</u> rights and stated that he was friends with Tressler and had tried to help her improve her living conditions. Simmons explained to Detective Perdue that on December 1, 2001, he and Tressler had been watching the Florida-Tennessee football game at his apartment in Mount Dora. The reception was bad, so Tressler asked him to take her to the laundromat or her trailer so she could watch the game. He took her to the laundromat and then drove home because Tressler and he were supposed to go to work together early the next morning for his father's landscaping business. He stated that he had engaged in sexual intercourse with Tressler on one occasion approximately two weeks before the interview, even though Simmons' semen was found in Tressler's vaginal washings during her autopsy. During a break in the interview, the detectives learned that blood had been found in Simmons' car. After the detectives informed Simmons of this, he stated, "Well, I guess if you found blood in my car, I must have did it."

<u>Simmons</u>, 934 So. 2d at 1105-08 (footnotes omitted). Mitochondrial DNA (mtDNA) evidence found in Simmons's car was consistent with that of Tressler's mother.[5] <u>Id.</u> at 9.

Because this jury did not hear the evidence that was initially presented during the guilt phase of trial, the State presented much of the same evidence through live witnesses during the new penalty phase proceeding. Other evidence

---

5. The State's forensic DNA analyst explained that mtDNA is inherited maternally, and mtDNA testing is a better technique than Short Tandem Repeat (STR) technique when the blood sample is degraded, as it was in this case. <u>See</u> <u>Simmons</u>, 934 So. 2d at 1108.

of aggravating circumstances was presented by way of stipulation and by a certified copy of prior convictions. The defense then presented its case for mitigation, and the State presented rebuttal evidence.[6]

After the jury issued its advisory verdict, the trial court held a Spencer hearing at which Simmons presented Dr. Cunningham to testify that Simmons was intellectually disabled as a child. No evidence was presented as to whether Simmons is intellectually disabled as an adult. Dr. Cunningham also testified that,

---

6. The mitigation evidence included testimony from Dr. Edward Wiley, a pathologist who testified that Tressler could have been unconscious when much of the injuries were inflicted. Pastor Bill Cox testified that Simmons grew up with an abusive father. Simmons's aunt, Faye Byrd, testified that Simmons was mentally slow growing up and that his home life was disruptive. Simmons's sister, Ashley Simmons, testified that their father was strict and sometimes abusive and that Simmons had a learning disability. Simmons's father, Terry Simmons, testified that Simmons was almost suffocated as a baby, was rushed to the hospital, and thereafter was slow mentally. Simmons's mother testified that she and her husband were strict and would also fight in front of the children. Simmons's aunt, Ruby D'Antonino, testified that Simmons was slow to develop as a child and that his grandfather was abusive to him. Eric Mings, Ph.D., a forensic psychologist specializing in neuropsychology, testified concerning Simmons's childhood and traumatic childhood incidents. Dr. Frank Wood, a neuroscientist and clinical neuropsychologist, testified concerning PET scan imaging of Simmons's brain. Dr. Michael Foley, a diagnostic radiologist, testified about the PET scan images. Dr. Joseph Wu, a psychiatrist and neurocognitive imaging director, explained the import of Simmons's PET scan. Dr. Mark Cunningham, a clinical and forensic psychologist, testified about Simmons's childhood familial and community factors affecting his development and actions; and finally Simmons's daughter testified about how much she misses her father. The State presented a psychiatric and neurology expert and a physician who was board certified in diagnostic radiology to rebut the PET scan evidence.

in his opinion, Simmons would adjust well to life in prison without the possibility of parole. Several correctional officers testified about Simmons's conduct in prison.

The trial court issued its sentencing order and, in finding and weighing the aggravating factors, the court found that Simmons had been convicted of a prior aggravated assault on a law enforcement officer in Lake County in 1996, which Simmons conceded. The arrest affidavit for that prior crime indicated Simmons was being pursued in a high-speed chase and deliberately veered into the officer's lane, causing him to take evasive action to avoid a collision. The trial court found this aggravating factor was proven beyond a reasonable doubt and gave it moderate weight. The court also found that the murder of Tressler was committed while Simmons was engaged in or attempting to commit a sexual battery, a kidnapping, or both. Simmons had been found guilty of the crimes of sexual battery and kidnapping in the first trial when he was convicted of the murder. The court assigned this aggravating factor great weight.

As a third aggravating factor, the trial court found the murder was especially heinous, atrocious, or cruel based on the testimony about Tressler's injuries and the fact that prior to her death, she appeared terrified as she attempted to escape from Simmons. Based on evidence that Tressler was in fear when she was kidnapped, had multiple defensive injuries inflicted by more than one weapon, and endured a

painful anal injury and multiple blows to her head, the court found that the murder was committed in an especially heinous, atrocious, or cruel manner. This aggravating factor was assigned great weight.

In mitigation, the trial court found that the statutory mitigating circumstance that the murder was committed while Simmons was under the influence of an extreme mental or emotional disturbance had not been proven by the greater weight of the evidence. The jury likewise unanimously rejected this statutory mitigator in the interrogatory verdict. As to the statutory mitigating circumstance that Simmons's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, the jury unanimously rejected this mitigator, and the trial court also found it was not proven. The trial court did find mitigation under the statutory catch-all provision that includes any other factors in the defendant's background that would mitigate against imposition of the death penalty. The trial court found, as did six members of the jury, that 29 mitigating circumstances were established, which were each accorded varying degrees of weight by the court.[7] Considering all 29 mitigating

---

7. These mitigating circumstances included evidence of a brain abnormality; learning disability; ADHD (Attention Deficit Hyperactivity Disorder); low IQ; alcohol abuse; lack of social skills; lack of education and academic achievement; being a hard worker; assisting his family; being loving to children, his family, and animals; being religious; lack of paternal guidance and bonding; childhood

circumstances in the aggregate, the trial court accorded this nonstatutory mitigation moderate weight overall. Two additional mitigating circumstances, which were not presented to the jury, were considered by the trial court based on evidence presented at the Spencer hearing. Mitigating circumstance (30), that Simmons was intellectually disabled as a child, was found proven by the greater weight of the evidence and given moderate weight. Mitigating circumstance (31), that Simmons would adjust well to life in prison, was found proven and the court gave it slight weight.

Lastly, the trial court separately considered the expert testimony presented at the Spencer hearing concerning the question of Simmons's intellectual disability in light of the United States Supreme Court decision in Hall v. Florida, 134 S. Ct. 1986 (2014), which held that Florida's strict cutoff of an IQ score of 70 could not be constitutionally enforced to preclude consideration of the remaining prongs of the test for intellectual disability as a bar to the death penalty. The Supreme Court held that the trial court must take into consideration the standard error of measurement of plus or minus five points along with the other two factors— adaptive deficits and onset before age 18.[8] The trial court proceeded to evaluate

poverty; sexual, verbal, and physical abuse of self and family members in childhood; and being a loving father.

8. Section 921.137(1), Florida Statutes (2014), provides generally that for a defendant to be intellectually disabled and not subject to the death penalty, the

the Spencer hearing expert testimony in light of the three-prong test for intellectual disability and concluded that Simmons's subaverage intellectual functioning did manifest before age 18 and was most likely caused by his early childhood brain injury after a near-suffocation incident. The court found that Simmons's range of test scores, mostly in the low 70s, when viewed with credible evidence that Simmons suffered oxygen deprivation as a child, indicated that subaverage general intellectual functioning was sufficiently established, and required further consideration of the adaptive deficit prong of the test.

As to the adaptive deficit prong, the trial court concluded that there was little evidence that focused on current deficits in adaptive functioning. Credible evidence was presented that as an adult, Simmons was able to function in the community, maintain employment, handle a bank account, and drive a car. Although evidence showed Simmons was immature for his age, he lived on his own, took care of his infant daughter, and was a father figure to his daughter's half-brothers. On this issue, the trial court concluded that there was a lack of credible evidence of concurrent deficits in adaptive behavior that is required for proof of intellectual disability. However, the sentencing order stated that "this

---

defendant must prove significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18.

court has duly considered mitigating evidence wherever it was presented in the record and has assigned moderate weight as nonstatutory mitigation to its findings of brain damage, learning disability, low IQ, ADHD, and evidence indicating mild intellectual disability as a child."[9]

After entry of the sentencing order in which the trial court imposed a sentence of death, this appeal ensued. Although Simmons presents multiple issues on appeal, we conclude that the Hurst claim is dispositive. Therefore, we decline to reach the other issues raised.

**ANALYSIS**

In Hurst v. Florida, the United States Supreme Court held that Florida's capital sentencing scheme violated the Sixth Amendment. 136 S. Ct. at 621. The Supreme Court concluded that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." Id. at 619. On remand from the Supreme Court, we held that "in addition to unanimously finding the existence of any aggravating factor, the jury must also unanimously find that the aggravating factors are

---

9. We do not have before us a claim for intellectual disability as a bar to the death penalty. Both parties, in their briefs, agree that this last prong, adaptive functioning, was "superfluous" because Simmons was not attempting to prove intellectual disability as a bar to the death penalty, but presented the evidence at the Spencer hearing simply as nonstatutory mental health mitigation.

- 13 -

<u>sufficient</u> for the imposition of death and unanimously find that the aggravating factors <u>outweigh</u> the mitigation before a sentence of death may be considered by the judge." <u>Hurst</u>, 202 So. 3d at 54. We further held that a unanimous jury recommendation is required before a trial court may impose a sentence of death. <u>Id.</u> Finally, we determined that the error defined in <u>Hurst</u> is capable of harmless error review. <u>Id.</u> at 67.[10]

We conclude that <u>Hurst</u> error occurred in this case even though the jury did make written findings as to the aggravating factors and the mitigation. Although this information was helpful to the trial court when Simmons was sentenced, it does not meet the requirements of the Sixth Amendment as mandated in <u>Hurst v. Florida</u> and the requirements of Florida's right to jury trial under article I, section 22, of the Florida Constitution, as we explained in <u>Hurst</u>. Although the interrogatory verdict provided in this case states the aggravating factors unanimously found by the jury, it does not show unanimous findings that the aggravating factors are sufficient to warrant imposing death, nor does it show that the jury unanimously found that the aggravating factors outweighed the mitigating

---

10. We rejected Hurst's contention that in light of <u>Hurst v. Florida</u>, section 775.082(2), Florida Statutes (2015), mandates that all sentences of death be commuted to life in prison without the possibility of parole. <u>Id.</u> at 66. We reject a similar claim raised by Simmons.

circumstances.  Significantly, the jury recommendation for death was not unanimous.

Because <u>Hurst</u> error occurred in this case, we turn to the question of whether that error was harmless.  The State, as beneficiary of the error, must prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for imposition of a death sentence did not contribute to Simmons's death sentence in this case.  We conclude that the State cannot meet this burden.

The jury voted eight to four in favor of death.  Even though the jurors unanimously found the aggravating factors, we cannot determine with any certainty which aggravating factors the jurors may have found sufficient to support imposition of death, nor can we determine whether four jurors voted for life because the aggravators were insufficient, the mitigators were weightier, or simply as an exercise of mercy.[11]  We decline to speculate as to the reasons why four jurors voted for life in this case.  Thus, we cannot say beyond a reasonable doubt that there is no possibility that the <u>Hurst</u> error contributed to the jury recommendation of death in this case.

---

11.  The nonstatutory mitigation was submitted to the jury as one list containing 29 possible mitigating circumstances with only one aggregate vote called for.  The jury's vote of six to six in finding those circumstances established, although indicating that only six jurors found <u>all</u> 29 circumstances proven, does not negate the possibility that other jurors found some or even most of the 29 circumstances proven.

# CONCLUSION

In light of the foregoing, Simmons's death sentence is vacated, and the case is remanded to the trial court for a new penalty phase proceeding.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
PERRY, J., concurs in part and dissents in part with an opinion.
CANADY and POLSTON, JJ., dissent.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PERRY, J., concurring in part and dissenting in part.

I concur with the majority's determination that the Sixth Amendment requires that we vacate Simmons's death sentence. However, because Florida law requires that Simmons be sentenced to life in prison as a consequence of his unconstitutional death sentence, I disagree with the majority's decision to remand for a new penalty phase proceeding instead of remanding for imposition of a life sentence. See § 775.082(2), Fla. Stat. (2016).

As I explained fully in Hurst v. State, 202 So. 3d 40, 75-76 (Fla. 2016) (Perry, J., concurring in part and dissenting in part), there is no compelling reason for this Court not to apply the plain language of section 775.082(2), Florida Statutes. Because the majority of this Court has determined that Simmons's death sentence was unconstitutionally imposed, Simmons is entitled to the clear and unambiguous statutory remedy that the Legislature has specified:

- 16 -

> In the event the death penalty in a capital felony is held to be unconstitutional by the Florida Supreme Court or the United States Supreme Court, the court having jurisdiction over a person previously sentenced to death for a capital felony shall cause such person to be brought before the court, and <u>the court shall sentence such person to life imprisonment</u> as provided in subsection (1).

<u>See</u> § 775.082(2), Fla. Stat. (emphasis added). The plain language of the statute does not rely on a specific amendment to the United States Constitution, nor does it refer to a specific decision by this Court or the United States Supreme Court. Further, it does not contemplate that all forms of the death penalty in all cases must be found unconstitutional. Instead, the statute uses singular articles to describe the circumstances by which the statute is to be triggered. Indeed, the statute repeatedly references a singular defendant being brought before a court for sentencing to life imprisonment. I consequently cannot agree that the statute was intended as a fail-safe mechanism for when this Court or the United States Supreme Court declared that the death penalty was categorically unconstitutional. <u>Cf.</u> <u>Hurst v. State</u>, 202 So. 3d at 66.

An Appeal from the Circuit Court in and for Lake County,
    Don F. Briggs, Chief Judge – Case No. 352001CF002577XXXXXX

James S. Purdy, Public Defender, and Nancy Jean Ryan, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Stephen D. Ake, Assistant Attorney General, Tampa, Florida,

for Appellee